**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT**

I, James Hendry, being first duly sworn, hereby depose and state as follows:

# I.  INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.  I have been a Special Agent with the FBI since July of 2017.  Prior to my employment with FBI, I was employed by the United States Department of Justice since December of 2012.  As a Special Agent with FBI, I have received formal training in identifying and investigating violations of federal law and have participated in all aspects of federal investigations.  Additionally, I have testified in judicial proceedings and prosecutions for violations of federal criminal law.  I have experience in public corruption and fraud investigations, as well as techniques associated with such investigations, including conducting interviews, executing search warrants, completing financial and telephone analysis, conducting surveillance, executing arrests, and recruiting and operating confidential human sources.  I have debriefed and participated in the debriefings of defendants, confidential human sources, and witnesses who had personal knowledge of fraud and bribery schemes.

2.     The facts in this affidavit are based upon personal knowledge derived from my participation in this investigation, my training and experience, phone analysis, information obtained by search warrant, Title III wire interceptions, and information obtained from witnesses, confidential human sources and other law enforcement officers and investigators working with the FBI, the DEA, the IRS and their partner law enforcement agencies. The facts in this affidavit are also based upon oral and written reports and documents about this investigation that I have reviewed from members of the investigation team, and discussions I have had personally concerning this investigation with experienced narcotics and tax fraud investigators.

1

On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I declare that the facts contained in this affidavit show that there is probable cause to charge the defendants listed below with the offenses specified in the attached Criminal Complaint, and that the attached Criminal Complaint be issued.

3.      Unless otherwise specified, the relevant time period addressed in this Affidavit is from about January 2014 through about July 21, 2020.

## II.  <u>INVESTIGATION OVERVIEW</u>

4.      Since at least 2019, the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS") and their partner law enforcement agencies have been investigating a far-reaching drug conspiracy centered around the industrial cultivation of marijuana in and around the Farmington, Maine area, and the subsequent laundering of the proceeds realized from its distribution.  LUCAS SIROIS, the defendant, is believed to be a leader of the organization (the "Sirois Organization").  As detailed further below, the Sirois Organization owned and operated multiple marijuana grows in Franklin County; SIROIS and his coconspirators, including his father, ROBERT SIROIS, the defendant, his estranged wife, ALISA SIROIS, the defendant, and former-Rangeley Selectman DAVID BURGESS, the defendant, sold a percentage of their marijuana and marijuana products to licensed medical marijuana caregivers in Maine; and SIROIS, BURGESS and ALISA SIROIS, among others, ensured that their scheme would evade detection by financial institutions by consistently falsifying in bank documents the nature of their illicit business.  However, a significant portion of the Sirois Organization's marijuana was sold on the black market and exported out of state through a network of coconspirators, including through BRANDON DAGNESE, the defendant, a convicted felon who was not enrolled in Maine's medical

marijuana program, and who engaged in over $1 million in black-market marijuana transactions for the Sirois Organization. A separate cell of the drug conspiracy controlled by RYAN NEZOL, the defendant, exported bulk marijuana for sale in at least New York, New Jersey, and Massachusetts.

5.    In addition to the black-market out-of-state transactions described above, the Sirois Organization's marijuana businesses were operated in violation of Maine's medical marijuana laws then-in force. Among other violations, SIROIS engaged in the industrial manufacture of marijuana at multiple large grow locations, and not only at the single authorized location registered with the Office of Marijuana Policy. At each of these locations, SIROIS and the Sirois Organization cultivated plants in excess of the numbers permissible under Maine law (typically only 30 mature and 60 immature plants). The Sirois Organization operated its flagship marijuana grow as a prohibitive collective as defined in Maine's medical marijuana law, paying employees a weekly cash salary to cultivate marijuana exclusively owned by SIROIS and his coconspirators, but papering the operation as though individual caregivers cultivated their own marijuana and sold it on an individual basis to SIROIS. The Sirois Organization also employed prior felons and others who were not properly registered as marijuana caregivers under Maine law.

6.    Cash proceeds of marijuana sales were funneled through a web of shell companies back to SIROIS and other coconspirators, including RANDAL COUSINEAU,[1] the primary financier of the Sirois Organization. In addition to utilizing a corporate structure to conceal drug proceeds, SIROIS and ALISA SIROIS also laundered those proceeds through real property,

---

[1]    It is anticipated that on about October 27, 2021, Cousineau will plead guilty to a One Count Information charging him with conspiracy to possess with intent to distribute marijuana in violation of Title 21, United States Code, Section 846. See United States v. Cousineau, 1:21-CR-141-LEW.

luxury vehicles, and joint corporate ventures with BURGESS in order to conceal the nature of those proceeds. Furthermore, and in furtherance of both the drug and laundering schemes, SIROIS, BURGESS, ALISA SIROIS, BRADLEY SCOVIL, and DERRICK DOUCETTE, the defendants, falsely affirmed to a financial institution ("Bank-1") that accounts they opened would not be directly or indirectly funded with the proceeds of marijuana businesses, when in fact, nearly all the funds that flowed through those accounts were profits from the sale of marijuana.

7.      In order to benefit the Sirois Organization, SIROIS directed revenue from his criminal marijuana cultivation and distribution businesses to public officials, including BURGESS, in order to induce them to take official public action. For example, in addition to the thousands of dollars that SIROIS paid BURGESS each week for his managerial role in the Sirois Organization, and in order to induce BURGESS to vote for a town referendum on a marijuana ordinance that SIROIS himself had drafted, SIROIS provided thousands of dollars to the Rangeley Internet Company, an entity that BURGESS controlled. In fact, financial records show that SIROIS supplied BURGESS with approximately $200,000 in cash between about March 2018 and July 21, 2020 constituting more than 80% of the total funding for the Rangeley Internet Company.

8.      Active members of Maine law enforcement were also on the payroll of SIROIS. SIROIS paid these officers to use official law enforcement resources in order to benefit SIROIS and his unlawful business interests. For example, SIROIS formed a marijuana distribution company with SCOVIL and DOUCETTE, in late summer 2019. For a period of months before leaving their employment with the Sheriff's Office, SCOVIL and DOUCETTE performed services for SIROIS in furtherance of their business, including using law enforcement databases

to obtain information about SIROIS and his associates for the benefit of the Sirois Organization. As detailed further below, in utilizing law enforcement databases for SIROIS's benefit in exchange for payments and other things of value (e.g., partnerships in a marijuana company with SIROIS), SCOVIL and DOUCETTE violated their duty as Sheriff's Deputies to maintain the confidentiality of law enforcement information.

9.      Even after formally cutting ties with the Sheriff's Office on about November 25, 2019, SCOVIL and DOUCETTE, at the direction of SIROIS, continued to leverage their law enforcement contacts to obtain information, and to illegally run inquiries across law enforcement databases, for the benefit of SIROIS.  During the course of the investigation, no later than about April 2020, SCOVIL, DOUCETTE and SIROIS began to suspect that they were being surveilled by law enforcement.  In an effort to identify which law enforcement entities were investigating them, SCOVIL and DOUCETTE reached out to a number of active members of law enforcement, including then-Wilton Police Officer KEVIN LEMAY, the defendant, and then-Oxford County Deputy Sheriff JAMES MCLAMB, the defendant.  SCOVIL and DOUCETTE convinced LEMAY and MCLAMB to run license plate numbers of the vehicles that were following them through law enforcement computers, and to provide them with any information they learned.  As an incentive to assist him, DOUCETTE offered to set up MCLAMB with an illegal marijuana grow.  Once LEMAY and MCLAMB became aware of this federal investigation, both LEMAY and MCLAMB deleted text messages they exchanged with SCOVIL and DOUCETTE in order to prevent them from being available in this prosecution.

10.      Ultimately, the Sirois Organization was able to learn that federal law enforcement was investigating their illegal marijuana cultivation, distribution, and related crimes.  KAYLA ALVES, the defendant, an Assistant District Attorney in the Franklin County

District Attorney's Office, who was also the next-door neighbor and former colleague of SCOVIL, tipped off SCOVIL that federal authorities were investigating the Sirois Organization. As a result, the Sirois Organization changed their methods of communication to favor in-person meetings, and turned their attention to "cleaning up" their grow locations in order to generate the illusion of compliance with applicable Maine medical marijuana laws. After ALVES learned that the federal authorities were investigating the Sirois Organization, ALVES deleted text messages she exchanged with SCOVIL on her cellular phone in order to ensure those messages were unavailable for use in this prosecution.

11.    In order to maximize the profits from his illegal marijuana trafficking, and in order to avoid paying in excess of $400,000 in federal taxes across tax years 2017 and 2018, SIROIS, in concert with BURGESS and KENNETH ALLEN, the defendants, filed a fraudulent amended income tax return for 2017, and a fraudulent income tax return for 2018. In each instance, ALLEN, who prepared the false returns, booked fictitious transactions that made it appear as though SIROIS's profitable companies made little or no revenue for the year. In 2017, for example, although SIROIS's actual taxable income exceeded $688,000, SIROIS's amended returns listed his taxable income as only $92,001. This disparity resulted in the corrupt elimination of some $237,000 in taxes that SIROIS owed to the federal treasury. Similarly, in 2018, SIROIS's true taxable income exceeded $600,000, but he only reported taxable income of $58,185, resulting in a loss to the treasury of over $190,000.

### III.    ILLEGAL CULTIVATION AND DISTRIBUTION OF MARIJUANA

#### A. Information provided by Cooperating Witness-1

12.    Members of the investigative team have conducted numerous consensual interviews with an individual previously employed by SIROIS ("CW-1"). CW-1 worked for

SIROIS from at least January 2019 through about the end of November 2019 at his primary grow facility, located at 374 High Street in Farmington, known as the "Shoe Shop." According to CW-1, CW-1 was terminated in about November 2019 because CW-1 continually advised SIROIS that his marijuana cultivation activities at the Shoe Shop were out of compliance with Maine's medical marijuana program; ultimately, rather than correct those compliance issues, which were extensive and significant, SIROIS simply terminated CW-1.[2] CW-1 has informed investigators that CW-1 believes in the healing power of marijuana, and CW-1 understands that SIROIS, apart from growing marijuana outside of compliance with Maine medical marijuana regulations, also uses various chemicals during cultivation that, according to CW-1, compromise the healing properties of organic medical marijuana. From my review of interview reports and discussions I have had with DEA agents who have personally debriefed CW-1, I have learned, among other things, the following:

a.      CW-1 was promoted by SIROIS in about March 2019 to clean the grow rooms at the Shoe Shop. CW-1 was again promoted in about the fall of 2019 into a role CW-1 described as an operations supervisor. During CW-1's employment, CW-1 was paid exclusively in cash. CW-1 received payment directly from SIROIS, and also from BURGESS, who CW-1 understood was a partner in the business with SIROIS. BURGESS reported to the Shoe Shop approximately three times per week. Beginning in about March 2019, BURGESS delegated the responsibility of paying Shoe Shop employees to CW-1. BURGESS would arrive at the Shoe

---

[2]      The information provided by CW-1 has been deemed reliable, in part because law enforcement has independently corroborated that information through physical and electronic surveillance, including through text message warrants, pole camera footage, and through analysis of financial records, all as described further below. CW-1 has a limited criminal history, which consists of an OUI conviction on May 1, 2019. CW-1 was promised immunity from prosecution in exchange for the information CW-1 provided.

Shop every Thursday with a bag of cash, and hand the cash to CW-1, who would in turn pay out the Shoe Shop employees.

b.      The Shoe Shop facility housed eight grow rooms, each containing numerous marijuana plants in various stages of cultivation.  During the approximately 11 months that CW-1 was employed at the Shoe Shop, it produced approximately 600 pounds of marijuana for distribution.  SIROIS hired individuals to cultivate that marijuana for him, and SIROIS paid those individuals a weekly cash salary.

c.      On at least one occasion, SIROIS directed CW-1 not to let state of Maine compliance investigators into the Shoe Shop facility.  SIROIS installed external cameras and a security system in order to detect approaching law enforcement in advance of their arrival, so that unlicensed individuals, including prior felons, who worked for SIROIS, including SIROIS's father ROBERT SIROIS could flee the Shoe Shop in advance of law enforcement's arrival.  ROBERT SIROIS collected a $1200 per week cash salary, ostensibly as a "custodian" at the Shoe Shop.

d.      In about late 2019, then-Franklin County Sheriff's Deputies SCOVIL and DOUCETTE formed a marijuana company with SIROIS called Narrow Gauge Distributors, Inc. ("NGD").  However, prior to the formation of the company, SCOVIL and DOUCETTE were routinely present at the Shoe Shop at the invitation of SIROIS, including while SCOVIL and DOUCETTE were still employed as members of law enforcement.  During this time, in about September 2019 through November 2019, DOUCETTE and SCOVIL were given a large office inside the Shoe Shop.  SCOVIL and DOUCETTE frequented the Shoe Shop while wearing their Sheriff's Deputy uniforms, and carrying their service weapons.

e.      Prior to forming Narrow Gauge Distributors, and while still employed as

Sheriff's Deputies, SCOVIL and DOUCETTE were provided with key access to the Shoe Shop. SCOVIL and DOUCETTE performed various tasks at the direction of SIROIS during this time period. For example, in about the fall of 2019, DOUCETTE picked up approximately 12 pounds of marijuana at a Bridgton, Maine dispensary and delivered that marijuana to the Shoe Shop. Further, SCOVIL obtained a booking photograph of CW-1, which CW-1 saw on SCOVIL's cellular phone. SCOVIL told CW-1 that when you are in law enforcement, you can find out a lot of things about people. SCOVIL further informed CW-1 that SCOVIL would drive through the parking lot of the Shoe Shop and run the license plates of the vehicles parked at the facility, in order to assist SIROIS in better understanding who he was employing, and who his customers were. Also during this time period, on occasions when SCOVIL and DOUCETTE were present in the Shoe Shop and other law enforcement vehicles entered the parking lot, both SCOVIL and DOUCETTE would "hit the ground" to avoid being seen by their law enforcement peers.

      f.      Based in part on CW-1's examination of the books and records maintained at the Shoe Shop, CW-1 estimated that SIROIS sold—and accounted for the sale of—approximately 75% of the marijuana he cultivated to licensed dispensaries and store fronts in Maine; the remaining 25% was sold on the black market and did not appear in the Shoe Shop's ledgers. In order to effectuate black market distribution, SIROIS employed a courier who regularly facilitated the transportation of marijuana out of state; DAGNESE previously served as that courier. Additionally, individuals from out of state traveled to the Shoe Shop to purchase marijuana for out of state distribution.

      g.      For example, CW-1 is aware of one such black market transaction involving four individuals who arrived at the Shoe Shop in a truck bearing Pennsylvania license plates. The individuals entered the Shoe Shop, and each carried a visible firearm. The

individuals loaded approximately 40 to 50 pounds of bulk marijuana into duffle bags and transferred those to their truck. Before the individuals could leave the Shoe Shop, they observed a Farmington Police Department marked police cruiser outside of the facility. SCOVIL created a courier card for the occupants of the truck, which SCOVIL indicated would "legitimize" the transportation of marijuana, in the event that law enforcement pulled over the truck after its departure. CW-1 understood that the transportation of bulk marijuana outside of the state of Maine violated Maine's medical marijuana laws.

        h.     At various times throughout CW-1's employment, SIROIS and BURGESS each informed CW-1 that SCOVIL and DOUCETTE had an agreement with SIROIS, whereby SIROIS paid SCOVIL and DOUCETTE $100 each per pound of marijuana that they sold on SIROIS's behalf, while SIROIS and his partners, including RANDALL COUSINEAU, kept at least $1,400 per pound of marijuana sold.

        i.     BURGESS informed CW-1 that SIROIS paid BURGESS $5,000 per week to "fix" SIROIS's problems. CW-1 was further informed by BURGESS that BURGESS was in possession of a "box" of bulk cash—proceeds of the marijuana business—that was originally stored inside the residence of SIROIS, and was then subsequently moved to BURGESS's residence

        j.     NEZOL worked for SIROIS performing tissue cultures at the Shoe Shop. CW-1 understood that NEZOL did a poor job and his position was likely terminated as a result (following CW-1's dismissal).

        k.     In addition to the marijuana grow located at the Shoe Shop, CW-1 is aware of at least five additional marijuana grows owned and operated by SIROIS. For example, SIROIS is a beneficial owner of an industrial marijuana grow located at a repurposed toy factory

located at 105 Avon Valley Road in Avon (the "Old Toy Factory").  Co-conspirator-1 and Co-conspirator-2 ("CC-1" and "CC-2") own the Old Toy Factory and run marijuana cultivation operations there.  SIROIS's interest is "silent," and not widely known, though the CC-1 and CC-2 operate the Old Toy Factory at SIROIS's direction.  SIROIS receives approximately half of the revenue generated by marijuana sales from the Old Toy Factory grow.  CW-1 learned these facts from BURGESS as well as first-hand from interaction with CC-1, CC-2, and SIROIS.  Profits from the Old Toy Factory grow have enabled SIROIS to expand his operations at the Shoe Shop.  According to BURGESS, SIROIS expected that his interest in the Old Toy Factory would generate approximately $55,000 in revenue per week.

l.      ALISA SIROIS, who is LUCAS SIROIS's estranged wife, has worked at the Shoe Shop as a caretaker in the past.  During that time, ALISA SIROIS and LUCAS SIROIS routinely informed other workers at the Shoe Shop that they could survive for approximately six years without income, due to the amount of cash that they had made as a result of the marijuana business.  ALISA SIROIS has an office in the same building as the Homegrown Connection, a marijuana cultivation supply store owned and operated by SIROIS, and is present at that office approximately once or twice a week.

m.      CW-1 attended a meeting at the Shoe Shop in about late 2019.  Also present at the meeting were BURGESS, COUSINEAU, and ALISA SIROIS.  BURGESS requested the meeting in order to inform COUSINEAU that LUCAS SIROIS was starting a new company, Narrow Gauge Distributors, with SCOVIL and DOUCETTE, and that he was doing so in order to circumvent SIROIS's original business arrangement with COUSINEAU, whereby COUSINEAU maintained a partnership interest in any future SIROIS marijuana ventures.  CW-1 believed that BURGESS informed COUSINEAU of SIROIS's intent to violate their business

arrangement, because BURGESS was close friends with COUSINEAU.  ALISA SIROIS was

present at the meeting in order to corroborate BURGESS's account of LUCAS SIROIS's recent

activities.  Following the meeting, COUSINEAU began frequenting the Shoe Shop on a regular

basis, in order to monitor and safeguard his investment interest in its operations.  Eventually,

after additional meetings on this topic that CW-1 was aware of, but did not attend, CW-1 learned

from BURGESS that SIROIS and COUSINEAU had reached resolution: COUSINEAU would

take a 25% interest in Narrow Gauge Distributors, leaving SIROIS, SCOVIL and DOUCETTE

with 25% each.

**B.  Conspiracy Communications**

    **a.  Black Market Sales**

13.    During the course of this investigation, judicially authorized search warrants for

communications and other information associated with the Sirois organization stored by

Facebook were executed.  I have reviewed warrant returns from Facebook, which include

Facebook Instant Messages sent and received by CW-1 and SIROIS, including messages sent on

about November 26 and 27, 2019, which can be summarized as follows.

| | |
|---|---|
| CW-1: | Do I have to move his on books?[3] |
| SIROIS: | Your call on that one. |
| CW-1: | Swell thanx |
| * * * | |
| SIROIS: | You never told me she pays 1400 for mids |
| CW-1: | I absolutely did and told u she would fill her store with our brand way before those kids came into picture . . . You told me to set her up |

---

[3]    All grammar, spelling, and similar errors reproduced in the summaries of electronic
messages contained in this Affidavit were present in the original messages.

SIROIS:        I have people in my network that are legal caregivers who I can get more that 1400

* * *

SIROIS:        We need to know who gets what and who pays what. 1400 was never cleared through me. I thought Brandon was are only 1400 guy. Nobody ever told me we had product on the books going out for 1400

CW-1:         She isnt on the books luke

* * *

SIROIS:        I will find someone else to buy it. If it isn't above boards don't do it.

CW-1:         We had the discussion in back room behind safe u me and dave … as much off books as possible

SIROIS:        Brandon is the only guy at 140p. 1400

CW-1:         I didnt get new memo … she has resale and retail for 1 store and is opening another

* * *

CW-1:         Of course .. I got rid of [Coconspirator-7 or "CC-7"]'s this morning thru Brandon for 1500 .. it wasnt on books so u want me to say I sold it to caregiver? No one else would take it … [Coconspirator-3 or "CC-3"] is going to find a way to move Sages stuff on books … But its rough and no one told me 4 of those lbs were cbd ..

SIROIS:        Yes that's fine. We won't get people's stuff anymore unless it's fire. Which basically means we are just doing our own until we find quality suppliers.

14.     Based on my training and experience and my involvement in this investigation, I believe that these messages are drug related. Specifically, when SIROIS and CW-1 discuss sales that are "off the books," I believe that they are describing black market sales that they understand fall outside of the scope of Maine's medical marijuana law. In summary, the conversation above concerns off-the-books, black-market sales of marijuana from the Sirois Organization to a

specific individual for $1400 per pound.  I know from my participation in this investigation, as well as from my discussions with agents who have debriefed CW-1, that $1400 per pound is approximately $600 per pound less than SIROIS wished to price his marijuana, and that price point meant that the marijuana was of lower quality and could not be sold for premium prices to marijuana distributors operating within Maine law, *i.e.*, licensed caregivers.

15.     When SIROIS wrote that he thought that "Brandon" was the only person to whom the Sirois Organization sold marijuana for $1400 per pound, SIROIS was referring to DAGNESE.  As described above, DAGNESE would sell Sirois Organization marijuana outside of the state of Maine to other black-market counterparties.  When CW-1 described a conversation in the "back room … behind [the] safe [with] u me and dave[,]" CW-1 was referring to a meeting between CW-1, BURGESS, and SIROIS, where SIROIS directed BURGESS and CW-1 to sell "as much off books as possible[.]"  Based on my discussions with agents who have debriefed CW-1, I understand that at this meeting, the three agreed to sell whatever substandard marijuana they had on the black market, including through DAGNESE, because it could not be sold to "legitimate" marijuana caregivers.

16.     When CW-1 wrote that CW-1 "got rid of [CC-7's] this morning thru Brandon for 1500 .. it wasn't on books so u want me to say I sold it to caregiver?" I believe based on my training and experience and my involvement in this investigation, that CW-1 meant that CW-1 was able to sell lower quality marijuana that the Sirois Organization had purchased from CC-7 to DAGNESE for $1500 per pound, and that the transaction was "off the books" on the black market.  CW-1 was asking SIROIS if they should book the transaction as though the marijuana was sold to a Maine medical marijuana caregiver.  When SIROIS responded "yes that's fine," I believe he approved the transaction.

17.     I have reviewed Facebook messages between SIROIS, BURGESS, SCOVIL and DOUCETTE, including messages sent and received on about March 6, 2020, from which I have learned that DOUCETTE wrote to the group that he "got some money from Brandon[,] to which BURGESS responded, "Nice[.]"  DOUCETTE then replied, "Gotta count it but it's a box full[.]"

18.     Based on my training and experience and my participation in this investigation, I believe that these text messages are drug related.  I know from the timing, and from the participants of this conversation, that the money DOUCETTE collected from DAGNESE was payment to the Sirois Organization for black market marijuana sales. I know from my review of DAGNESE's criminal history, among other law enforcement documents, that DAGNESE is a convicted felon, and is ineligible to participate in Maine's medical marijuana program; therefore any transaction involving DAGNESE is illegal under Maine law.  Further, I believe that when DOUCETTE stated that he received a "box full" of money from DAGNESE, he was referring to a box full of cash, which is indicative of a black-market marijuana transaction.

19.     During the course of the investigation, search warrants for electronic messages and related information associated with target telephones were executed on various service providers, including with respect to device assigned the cellular phone number 207-670-6616 used by SIROIS (the "SIROIS Cellphone").   I have reviewed warrant returns, from which I have learned that on about April 1, 2020, the SIROIS Cellphone received two text messages from a cellular phone assigned call number 207-303-9477 used by DAGNESE (the "DAGNESE Cellphone") summarized as follows:

| Date/Time | Sender | Reciever | Content |
|---|---|---|---|
| 4/1/2020 12:41 p.m. | DAGNESE Cellphone | LUCAS SIROIS Cellphone | doing this for no reason? Like I'm lying to you when I toldyou I've already taken a loss on product I can't move and is still sitting atthe lab, like l |
| 4/1/2020 12:41 p.m. | DAGNESE Cellphone | LUCAS SIROIS Cellphone | ol … as if dude. Don't threaten me Luke, I've done nothingbut do what I could for you when you hit me up and gave you how much $$$? I'llcall you today. |

20.     I believe the text message exchange summarized above is drug related. When DAGNESE stated "Like I'm lying to you when I toldyou I've already taken a loss on product I can't move…" I believe that DAGNESE is informing SIROIS that he had not been able to sell bulk marijuana and marijuana byproducts that he had purchased from SIROIS on credit, and that the marijuana in question (the "product") was still at DAGNESE's lab. I further believe that when DAGNESE wrote, "Don't threaten me Luke, I've done nothingbut do what I could for you when you hit me up and gave you how much $$$?" DAGNESE was referencing a lucrative marijuana partnership that had produced profits for both parties.

     **b.** <u>**Narrow Gauge Distributors**</u>

21.     I know from my review of corporate records on file with Maine's Secretary of State that Narrow Gauge Distributors was formed on about July 26, 2019 by ALLEN.  Further, I know from my review of bank records on file with Bank-1 that an account was opened in the name of Narrow Gauge Distributors on September 11, 2019, and that the authorized signatories on the account are SIROIS, SCOVIL, and DOUCETTE.

22.     I have reviewed Facebook messages between SIROIS, SCOVIL and DOUCETTE, including messages sent and received beginning in about July 2019 through at

least about July 2020, which track the creation and operation of NGD, including the messages

summarized below that were sent and received on July 18, 2019, among many others:

SIROIS:      You guys need no less than 50% as the founders and the ones who want to operate it.

DOUCETTE:   I agree. Certainly would like a higher number so we can bump that up higher I'm sure. Brad?

SCOVIL:     Yea it needs to be higher.  I've been brain storming and we might be able to do this Luke with little to no fronted money if we find the right people who trust us and will work for us

SIROIS:      I'm all ears

SCOVIL:     I think the main goal is to get something into law that mandates weed sales MUST to go thru a distributor.  Without that there is no point in this business.  Why would someone want to add a middle man.  Yes it's easier for a store front to deal with one person but I don't think the profit margins are there for that.  As far as money I don't think I need an investor.  If I can get the grower to net 30 it won't be an issue because I can move the product and pay the grower within 30 days.  After a year of that you would have a established bank account where you could pay the grower upon receipt of the product.

23.     Based on my training and experience and my participation in the investigation, I

believe these messages are drug related.  Specifically, I believe that SIROIS is offering SCOVIL

and DOUCETTE a 50% interest in NGD, as the "founders" and "operators."  I believe that

SCOVIL's lengthy message details the business model for NGD.  Specifically, SIROIS,

DOUCETTE, and SCOVIL sought to implement a Maine marijuana law which would mandate

that all caregivers and/or other marijuana cultivating interests in the state would be compelled by

law to use a "distributor," or a middleman, which would purchase from the cultivator and then

sell to caregivers and other interests that would, in turn, sell to patients.  Based on my

involvement in this investigation, I know that such entities—third party middlemen who acted as

brokers between cultivators and end-point distributors of marijuana—were never established in

Maine's medical marijuana legal regime. I also know from my review of these and other

electronic messages that SIROIS made significant efforts to bring about this change in the law,

including repeated attempts to meet with a variety of elected officials, as well as substantial

payments to various consultants.

  24. On about July 21, 2020, I and other members of law enforcement conducted

multiple searches of locations where the Sirois Organization was believed to operate, including

an address in Livermore believed to be the residence of DOUCETTE. Among other items seized

from the DOUCETTE premises was a handwritten sheet of paper, an image of which appears

below:[4]



---

[4] It should be noted that the actual name of CC-3 has been redacted and replaced with "CC-3" in the reproduction of the flowchart.

I believe that the image above shows a flowchart depicting NGD's operating model. Based on my involvement in the investigation, I believe that NGD stands for "Narrow Gauge Distributors," that LM stands for "Lakemont" and that PO stands for "Purchase Order." I believe that "Flower" refers to marijuana. As described above, Lakemont is a corporate entity controlled by SIROIS that conducts operations at the Shoe Shop.

25.     Based on my participation in the investigation, and on my training and experience, I believe that this chart shows that NGD acted as a distributor, purchasing from the cultivator (Lakemont) and then selling to a third party, CC-3. For each pound of marijuana bought and sold, NGD made a $200 commission. Based on my participation in this investigation, I am aware that under Maine's medical marijuana law in effect during the relevant time period, this business model was illegal, because the law only permitted caregivers to wholesale 75% of their crop in a given year. According to this model, NGD did not cultivate any marijuana at all; nor did NGD sell directly to patients: as described in the model, CC-3 him/herself takes a "cut," of each sale, indicating that CC-3 is a broker and/or caregiver and not an end-user of the marijuana.

26.     I have reviewed additional Facebook messages between SIROIS, BURGESS, SCOVIL and DOUCETTE, including the messages summarized below that were sent on about December 9, 2019:

DOUCETTE:       Just so we are all on the same page Dave can you deposit 1k into NGD account that brad and I will split for our management duties at the Shoe Shop. You can add last weeks for this coming Friday if it's easier for you. Will you be around for the 2pm growers meeting today? [CC-3] is coming tomorrow we have a tally on spreadsheet live of everything currently ready to go.

BURGESS:        Luke and I spoke because we're not getting 1400 a pound if you can keep the four grand I'm gonna give you off the books you guys

> can use that for your pay to make it cleaner. The 55…is that include what you set out for [CC-3] or above and beyond ?

SCOVIL:    Sorry was out back weighing didn't see this. I guess there was some disconnect. I thought or was under the impression that derrick and I would get 500/week to manage and run the shoe shop. That is why we have spent over 100+ hrs restructuring this place, setting up meetings, getting everyone to work together, weighing product etc. I also thought that is why we didn't hire an HR person … The money that has been coming in has been to keep us above the bills. We haven't taken a paycheck from NGD yet. Our last paychecks from the cop gig was on December 5th. I guess we will need some direction moving forward from Luke as to stay status quo or what to do. The idea when we talked was to save LM money. We've cut weekly payout by over 3,000 and have tried to pick up that slack ourselves by weighing, cleaning, etc…

27.     I know from my participation in this investigation, and from my training and experience, that these messages are drug related. Based in part on my review of interview reports and discussions with DEA agents who have debriefed CW-1, I know that BURGESS has a managerial role in SIROIS's drug operations, and I know that after CW-1 was fired in about late November 2019, SCOVIL and DOUCETTE took on some of CW-1's responsibilities at the Shoe Shop. When DOUCETTE asked "Dave" to "deposit 1k into NGD account" for his and SCOVIL's "management duties," he was asking BURGESS to pay him and SCOVIL for work they had performed over the past week for Lakemont. When BURGESS wrote that "they" were not getting 1400 a pound, and so he proposed to simply provide $4,000 to SCOVIL and DOUCETTE "off the books" to "make it cleaner," I believe that he was referring back to the NGD business model: marijuana sales that SCOVIL and DOUCETTE facilitated had failed to yield $1400 per pound to Lakemont because, in part, of NGD's commission. Further, a price point below $1400 per pound indicates that these sales were black market sales, as described further above. Off-the-books payment to SCOVIL and DOUCETTE is also consistent with black market revenue. When SCOVIL wrote that he and DOUCETTE had spent over 100 hours

restructuring the Shoe Shop, I understand that he and DOUCETTE spent significant time organizing and managing the facility, including working directly with marijuana ("weighing"), at least in part during the time that they were employed as Franklin County Deputy Sheriffs.

### c.  Operation of the Sirois Organization

28.     I know from my involvement in the investigation that on June 25, 2020, law enforcement obtained judicial authorization to intercept voice and electronic communications occurring over the SIROIS Cellphone.  From about June 26, 2020 to about July 21, 2020, agents monitored criminal communications made over the SIROIS Cellphone.  I have reviewed transcripts of pertinent intercepted communications over the SIROIS Cellphone and conferred with members of the investigative team about the contents of the intercepted communications, from which I learned that SIROIS was actively engaged in the distribution and cultivation of bulk marijuana at numerous facilities, including several industrial marijuana grows such as the Shoe Shop and the Old Toy Factory.

29.     On about July 1, 2020 at approximately 10:14 am, agents intercepted a telephone call from the SIROIS Cellphone to a cellular phone assigned a call number known to me (the "CC-1 Cellphone") (Session 395).  I am familiar with subscriber records relating to the CC-1 Cellphone, from which I learned that CC-1 is the listed subscriber.  CC-1 and SIROIS discussed the operation of the industrial marijuana grow located at the Old Toy Factory during the call, summarized and analyzed as follows:

a.     CC-1 stated, "So I think I'm right about around 180 put into Spruce Valley right now.  So I think what we gotta do is start weekly – I don't know if you want to go weekly or monthly, but take the operating expenses, and then me and you split the rest … during the week.  And then we should be in good shape, hopefully.  It's time for me to make some

money. I know I've spent some." SIROIS replied, "Nice." Subsequently, CC-1 stated, "once we get there, we'll just start splitting weekly expenses and all that bullshit. Operating costs. And we'll split it down the middle." SIROIS responded, "Sounds good." SIROIS asked, "where are we at on the weekly yields now? I know we had been getting 20, 21. Is that creeping up towards 25 yet?" CC-1 replied, "Yeah. That – we should be. This week looks like it may be. We should be there. And it's getting better weekly."

        b.      I believe that in this portion of the conversation, that when CC-1 referred to Spruce Valley, they meant Spruce Valley LLC ("Spruce Valley"). A review of corporate documents relating to Spruce Valley maintained by the Maine Secretary of State's office reveals that SIROIS and CC-1 are beneficial owners of Spruce Valley. A review of the deed describing 105 Avon Valley Road, reveals that Spruce Valley is the owner of that property. I believe that when CC-1 stated that CC-1 had 180 into Spruce Valley, CC-1 meant that CC-1 had, over time, contributed $180,000 into the operating account held by Spruce Valley, and that going forward, CC-1 and SIROIS, should split the proceeds from the operation of the Old Toy Factory (profits to Spruce Valley) on a monthly or weekly basis, after accounting for operating expenses. I believe that when SIROIS asked about weekly yields, he wanted to understand how many pounds of marijuana were produced each week at the Old Toy Factory.

        c.      Later in the conversation, SIROIS and CC-1 discussed a state inspection of the Old Toy Factory, as follows:

CC-1:      They've got all their stuff . . . . Me and [CC-2] are actually buying it off the stalk and selling it to [Company-1], as well. So I think we're out of that grey area, or try to be, as a collective. You know, we're all selling it to one entity. I talked to [CC-2] about it after my conversation with Dave the other day … because, you know, that whole – this – it's a whole mess there … and then [CC-2] breaking down like payroll. It's broken down per plant that comes out of a room, whatever that comes out. It could be different weekly. But that's the way [CC-2] is doing it right now. So

22

technically they're on payroll, but the payroll is justified by the plant count and is broken up by the amount of plants that we take out of their room. So if they make 1,000 bucks a week, and then we get, you know, whatever, seven plants or whatever, then it's broken up into that, you know, how much the weekly payroll is per plant.

SIROIS:      Yep. Yeah, I mean, as long as you can, with a straight face – this is the conversation we've talked about a bunch of times. . . . Basically tell the inspector that this is not a collective, right? Because they're not supposed to be employees of you or [Company-1] in order to grow that weed, because the state could possibly try – make the attempt to go – look at you, or us, and go, "so you pay them like employees."

CC-1:        Yeah.

SIROIS:      "So all the weed's yours? All the weed in this building's yours?"

CC-1:        Yeah

SIROIS:      "No, it's theirs."

CC-1:        It's theirs, but we're buying it.

SIROIS:      Right.

CC-1:        But I don't think we gotta worry about them for a little bit. My thought on that, because like I said, they won't give me the building anyway with this stuff, and it's just me and [CC-2] that are getting inspected at the moment. Nobody else is getting any letters. So we're going to go with that for now.

    d.    I believe that in this portion of the call, CC-1 and SIROIS are discussing how to fraudulently communicate to state inspectors that the Old Toy Factory was in compliance with Maine's medical marijuana regulations, while acknowledging among themselves that it was actually out of compliance. I know from, among other things, information provided by Maine's Office of Marijuana Policy, that operating a marijuana grow as a "collective" is illegal in Maine. In other words, if an individual caregiver hires multiple other caregivers as employees, and pays them a salary to grow marijuana plants that he actually owns on his behalf, that would be in violation of the parameters of the marijuana caregiver license. Caregiver licenses in Maine only

permit cultivation of a set number of marijuana plants, usually 30 mature plants and 60 immature plants.  To get around this restriction, SIROIS instructed CC-1 ("if [they] can keep a straight face") to lie to the inspector and to tell him that CC-1 does not have employees, but rather pays individual caregivers on a per plant, or per pound basis for the marijuana belonging to each individual caregiver cultivated in their own room at the Old Toy Factory, rooms that CC-1 leases to those individual caregivers.  This fiction is summarized by SIROIS and CC-1 in the portion of the call described above: "All the weed in this building is yours?" asked SIROIS, anticipating the question from the inspector.  "No, it's theirs and we're buying it[,]" replies CC-1, demonstrating that he understood what needed to be said to convince an inspector that the Old Toy Factory was in compliance, and was not being operated as an illegal collective.

30.    I have reviewed additional Facebook messages between SIROIS, BURGESS, SCOVIL and DOUCETTE, including messages sent on about December 2, 2019, summarized below:

| | |
|---|---|
| SIROIS: | Just to be clear, I want [CW-1] to turn [CW-1's] keys in.  I don't want [CW-1] in the building for the simple fact that I fired [CW-1].  That doesn't mean [CW-1] can go do another job there instead.  If [CW-1] is still in the building, this will never get any better.  Going into 2020. |
| * * * | |
| BURGESS: | So [CW-1] is a caregiver … [CW-1] cannot work [CW-1's] room? |
| SIROIS: | Nope. Don't need [CW-1]. |
| * * * | |
| SIROIS: | [Two individuals] have caregiver cards. |
| SCOVIL: | I'll get my caregiver paperwork in the mail tomorrow morning just in case you need a name for a room.  It won't hurt as a back up plan should [Individual] leave too. |
| DOUCETTE: | I'll do the same. |

| SIROIS: | We may have enough spares, but if [Individual] walks with [Individual], then we would need 2 caregivers for sure. |
|---|---|
| SCOVIL: | Consider it done! |

31.    Based on my training and experience and my involvement in the investigation, I believe that this Facebook message exchange is drug related.  Specifically, this exchange reflects that the same legal fiction existed in the Shoe Shop's operations, as existed at the Old Toy Factory.  The messages were sent as BURGESS, SCOVIL, DOUCETTE and SIROIS discussed terminating CW-1's employment at the Shoe Shop.  BURGESS pointed out that because CW-1 was a caregiver, who was then cultivating marijuana at a room in the Shoe Shop, CW-1 could be relieved of CW-1's responsibilities as a manager and compliance person at the Shoe Shop and could continue "work[ing CW-1's] room" – i.e., cultivating marijuana.  SIROIS refused, noting that he did not need CW-1 because he had other individuals in his employ who held caregiver cards, and he could continue cultivation of the marijuana in the room that CW-1 worked using the names of these other individuals.  I know from, among other things, information provided by Maine's Office of Marijuana Policy that this practice is further evidence that the Shoe Shop was operated as an illegal collective.  In other words, the marijuana in CW-1's grow room did not belong to CW-1; it belonged to SIROIS, and SIROIS could determine who would cultivate it.  I know from my discussions with DEA agents who debriefedCW-1, that CW-1 attempted to take CW-1's marijuana when CW-1 left the Shoe Shop, but that CW-1 were prevented from doing so by SIROIS.

32.    On about July 3, 2020 at approximately 2:26 pm, agents intercepted a telephone call from the SIROIS Cellphone to a cellular phone assigned call number (207) 491-9733 (the "ROBERT SIROIS Cellphone") (Session 816).  I know from my participation in this

investigation that ROBERT SIROIS is the father of LUCAS SIROIS, and from my review of law

enforcement records, including the criminal history of ROBERT SIROIS, that ROBERT SIROIS

is a prior drug felon, who is therefore ineligible to participate in Maine's medical marijuana

program.  The following is a summary and analysis of relevant parts of the intercepted

conversation between ROBERT and LUCAS SIROIS (for clarity, I will refer to them as LUCAS

and ROBERT):

| | |
|---|---|
| ROBERT: | Well, you know, it showered last night.  I didn't even go down and check today.  I went down to check them yesterday, and they were – you know, still damp enough. |
| LUCAS: | Yep. |
| ROBERT: | So I figured I'll wait until Monday to go hit them again. |

* * *

| | |
|---|---|
| LUCAS: | So I was kind of thinking that probably we ought to fucking run one more round of veg nutes to them.  Probably get them fed one more time … and pinch them back and maybe one more round of – one more little aerating round.  And then they really ought to take off like a fucker if we do that this month. |
| ROBERT: | Huh. |
| LUCAS: | So I just didn't know that to – like Monday if you want to get those guys on that and go do that.  I'm trying to get some plants planted in Rangeley. I'm trying to fucking deal with these other grows, so it's sucking up a lot of my time. |

33.    I believe that in the portion of the call described above, LUCAS and ROBERT

discussed their joint undertaking of the cultivation of marijuana.  When ROBERT stated that he

checked "them yesterday" and that "they" were still "damp enough," he meant that he had

checked on marijuana plants and that they were sufficiently watered, but that he will "hit them

again" (with water) on Monday.  When LUCAS responded that he believed they required

another "round of veg nutes," I believe he meant that the marijuana plants at issue required

vegetable nutrients.  LUCAS asked ROBERT if he would "get those guys and go do that," meaning that ROBERT should take LUCAS's employees to the marijuana plants in question, and to provide them with nutrients and to aerate them, as LUCAS had suggested.  LUCAS justified the request by describing how busy he was "deal[ing] with these other [marijuana] grows."

34.    The call at Session 816 continued as follows:

ROBERT:    How's Avon doing?

LUCAS:    Avon's doing fine.  But I gotta get fucking [CC-1] to stop fucking back-dooring on the fucking black market just to get more money.

ROBERT:    Huh.

LUCAS:    [They're] supposed to commit to giving me all the weed so we can take care of our stores and build our brand because our yield at the Shoe Shop is so low.  And fucking [unintelligible] one fucking half of it to somebody else because they're willing to pay more money.  I'm like, [CC-1,] when the feds show up and arrest you, don't be fucking upset.

ROBERT:    Huh.

LUCAS:    I'm like, they're around, dude.  They're still watching.  And I was like – I – you know, Brad's been followed several times, and it could be federal, you know.

ROBERT:    Huh.

LUCAS:    And so if they're watching Brad, they're probably watching me.  They're probably always watching me.  And they know I got a facility in fucking Avon.  So if they ever caught wind that fucking Avon weed is in Massachusetts or something, even if it wasn't us that put it there, you can fucking bet your ass they're going to go all the way to the fucking root.

35.    I believe that in the portion of the call described above LUCAS informed ROBERT that he was aware that CC-1 sold a portion of the marijuana cultivated at the Old Toy Factory (referred to above as "Avon") on the black market for distribution in Massachusetts.  I believe that LUCAS is particularly concerned about this because LUCAS believes that he is being investigated by law enforcement, as evidenced by the fact that SCOVIL informed LUCAS that SCOVIL was

followed by law enforcement.  LUCAS is particularly concerned about the black-market activity

at the Old Toy Factory, because LUCAS is aware that black-market sales for distribution outside

of the state of Maine are outside of the auspices of Maine's medical marijuana program, which

would leave LUCAS, CC-1 and others exposed to federal criminal prosecution.

36.    I have reviewed Facebook messages between SIROIS, SCOVIL, BURGESS, and

DOUCETTE, including messages sent and received on about December 22, 2019, which, among

other things, demonstrate ROBERT SIROIS's involvement in Shoe Shop operations.

SIROIS:        Flower rm 7 didn't get water ed enough fri.  got some plants
               starting to stress and someone left th far sink running all weekend.
               Good thing pump didn't fail.

DOUCETTE:      What the heck.  Everyone to anxious to leave Friday

SIROIS:        That message was from my dad

* * *

SIROIS:        We are going to go to the 7 plant, 10 week cycle.  We can start that
               this week.  Just come up with the best way to transition into it.

DOUCETTE:      Sounds good.  I think your old man probably knows the easiest
               transition.  We will work with him to make it happen

37.    I believe that these Facebook messages show that ROBERT SIROIS was deeply

involved in the cultivation of marijuana at the Shoe Shop.  For example, the message that begins

this exchange was originally sent by ROBERT SIROIS and was forwarded by LUCAS SIROIS

to the group.  It shows that, at a minimum, ROBERT SIROIS was present in the Shoe Shop

inspecting plants and the facilities checking up on the care that the marijuana plants were

receiving.  He recommended additional water for the plants in Room 7.  ROBERT SIROIS was

also going to work with SCOVIL and DOUCETTE to transition the marijuana plants to a 10-

week cycle, meaning that periods of light and dark would be adjusted to ensure that the

marijuana plants were ready to harvest in 10 weeks' time. I know from my review of law enforcement records that ROBERT SIROIS is a convicted felon. I know from the Maine Office of Marijuana Policy, among other sources, that it was a violation of Maine's medical marijuana law then-in effect for an unlicensed individual to assist a caregiver in the cultivation of marijuana.

38.    I have reviewed Facebook messages between SIROIS and BURGESS, including messages sent and received on about November 26, 2019 concerning ROBERT SIROIS:

SIROIS:        We should probably have [Individual] spray the rooms until we find someone qualified. I definitely want more qualified people and I need to be involved in the interview process somehow.

BURGESS:    Ok

SIROIS:        Can you talk to my dad and figure out what the issue is?

BURGESS:    Yes

SIROIS:        Last thing I need is dad being frustrated

BURGESS:    I'm not sure what you're referring to

SIROIS:        The sprayer guy who was hired apparently has no clue. That one

BURGESS:    Oh

SIROIS:        You need to talk to [Individual] also. The quality of our product has gone downhill. I just got a picture of our tops. Trimmed terribly. Too much stem showing. It's time to fire people and hire new ones.

BURGESS:    [Individual] is obviously not doing his job

SIROIS:        [Sends photograph of plastic bag containing harvested marijuana]

BURGESS:    He knows you asked [Individual] to take over the trim crew

SIROIS:        As I have a right to put together a plan B if needed…. The quality of the product has gone downhill. They don't follow rules, they don't respect me, they argue with my dad who is typically correct. [Individual] either needs to pump out A grade or he's gotta go.

39.     I believe the messages above relate to ROBERT SIROIS's involvement in the Sirois Organization, and demonstrate the significant role ROBERT SIROIS played in directing the marijuana cultivation activities at the Shoe Shop.  For example, LUCAS SIROIS directed BURGESS to talk to his dad (ROBERT SIROIS) to help solve a personnel issue at the Shoe Shop involving the spraying (of pesticides) on the marijuana crop, in an attempt to resolve issues of declining quality in the marijuana product LUCAS SIROIS was producing.  LUCAS SIROIS expressed frustration with his employees working at the Shoe Shop who "don't respect me" and who "argue with my dad who is typically correct."  I believe that LUCAS SIROIS meant that his employees do not listen to ROBERT SIROIS when he directs them to adjust their method of cultivation, as part of ROBERT SIROIS's responsibilities at the Shoe Shop grow.

40.     I have reviewed Facebook messages between SIROIS, BURGESS, SCOVIL and DOUCETTE, including messages exchanged on January 21, 2020 concerning ALISA SIROIS:

SCOVIL:     Dave I'm giving LM 40k today that came in yesterday.  Do you want cash or check?

BURGESS:     Cash please . . . Lisa will be down today to get the money orders for you.

41.     Based on my participation in the investigation, I believe that these messages concern NGD's interaction with Lakemont, and show that ALISA SIROIS ("Lisa") is involved in the financial aspects of the Sirois Organization.

42.     On about July 3, 2020 at approximately 1:50 pm, agents intercepted a telephone call from the SIROIS Cellphone to a cellular phone assigned call number (207) 491-4405 (the "ALISA SIROIS Cellphone") (Session 807).[5]  The following is a summary and analysis of

---

[5]     I know that the ALISA SIROIS Cellphone is used by Alisa Sirois because, among other things, she is listed as the phone's subscriber by U.S. Cellular (as Alisa Merwin).

relevant portions of the call between LUCAS and ALISA SIROIS (who I will refer to here as

LUCAS and ALISA, respectively, for clarity):

| | | |
|---|---|---|
| LUCAS: | I was wondering.  I was talking to [CC-1] earlier, and I didn't know if maybe you could talk to [CC-1] at some time about basically not selling weed to [CC-4] anymore.  [CC-1] screwed me again this week and randomly told me that [CC-1] gave [CC-4] 10 to 12 pounds of weed.  So I'm just pissed [unintelligible] by [CC-1] fucking being an asshole, so | |
| ALISA: | [CC-1] can sell it for more money than you can.  So why the fuck [unintelligible] | |
| LUCAS: | [CC-1] is selling it on the black market, though.  It's going to Massachusetts.  That's the problem. | |
| ALISA: | Well, once [CC-1] sells it to [CC-4], that's [CC-4's] concern, not ours, right? | |
| LUCAS: | Right.  But most important thing to me is to build our brand.  That's going to have the most value.  Like it already . . . so what I'm saying is, [CC-1] told me that [CC-1 would] give me all of it. | |

43.    Based on my participation in the investigation, I believe that this call is drug

related.  Specifically, I believe that LUCAS and ALISA are discussing black market sales of

marijuana by the Sirois Organization to interests in Massachusetts.  LUCAS asked ALISA to see

if she could speak to CC-1 in order to redirect black market sales back to LUCAS and NGD, so

that LUCAS could continue to build the NGD brand.  Among other things, ALISA indicates that

these black-market sales were not "our" concern (meaning LUCAS and ALISA), because it was

a third party, CC-4, who was actually selling marijuana out of state.  However, as the recording

of this call makes plain, LUCAS and ALISA understood that their marijuana was being sold out

of the state of Maine, which I know constitutes a violation of Maine's medical marijuana law

based on information provided by the Office of Marijuana Policy.

### d. **The Nezol Cell**

44.     I know from my involvement in the investigation that on March 6, 2020, law enforcement obtained judicial authorization to intercept voice and electronic communications occurring over the cellphone assigned call number 207-491-2733 (the "NEZOL Cellphone"). Agents monitored criminal communications over the NEZOL Cellphone for a period of 30 days, beginning on March 9, 2020.  I have reviewed summary transcripts of pertinent intercepted communications over the NZEOL Cellphone and conferred with members of the investigative team about the contents of the intercepted communications, from which I learned that NEZOL was an active drug dealer during this time period, arranging dozens of bulk marijuana transactions, including with individuals who traveled from out of state in order to consummate those transactions.  Intercepts also showed that NEZOL worked for and transacted with SIROIS during this time period, including selling bulk quantities of marijuana distillate to SIROIS, as well as assisting in cultivating marijuana plants at the Shoe Shop.  Among other tasks, SIROIS paid NEZOL to perform tissue culturing[6] on his plants during this time period.

45.     On March 14, 2020, at 1:18 p.m., agents intercepted an incoming call to the NEZOL Cellphone from a device assigned call number ending in 4448 (Session 700).  The following is a summary of relevant portions of the call between NEZOL, the defendant, and the unidentified counterparty ("UM4448"), as reflected on the line sheets recorded by the intercepting agents:

---

[6]     Tissue culture refers to a collection of techniques designed to maintain or grow plant cells, tissues, or organs under sterile conditions in culture media.  Tissue culture is a process widely used to produce plant clones and preserve plant genetics lately being adapted by marijuana growers to preserve the genetics of particular desirable strains of marijuana.

a.    UM4448 stated the following: I am going to have to pass this shit, and I thought I was going to have it ready today.  It's Luke's stuff.  It will be really nice after the second pass.  It has some green shit in it, but it's not the same type of green as the blue shit.  It's got real chlorophyll, green shit in it.  NEZOL responded: that's weird.  UM4448 replied: maybe I should've filtered it, but I got some crazy good terps off of it.  It might be 250 milliliters. NEZOL responded: wow that is fucking crazy.  UM4448 stated: most of it was live resin.  It was probably sitting for a long time.  NEZOL stated: I met with Luke the other day.  I got paid again and he [Luke] is pumped about everything that we're doing and to keep working on shit.  Later in the call, NEZOL stated: Luke asked me to get a kitchen set up for him, keep working on the tissue culture, start the extraction stuff, and get quotes and estimates for a blast room idea.  After a discussion of whether air filtration systems would be needed for the "kitchen," the cost of such a system, and who could install such a system, NEZOL stated: We can run certified C1D1 blast rooms and even if we are making stuff off the books, tie the fucking number of the blast room on the material.  The blast room certified number is key…. It's better to bring stuff in that you can say is certified.  UM4448 stated that he agreed, and that they don't even care as much about the product but I think we'll be doing good with both.

46.    I believe that the call described above is drug related.  Specifically, based on this interception and subsequent interceptions, agents believe that UM4448 and NEZOL are discussing the manufacturing of marijuana shatter or marijuana distillate.  Marijuana distillate is a runny translucent oil devoid of waxes and other undesirable compounds from the original plant.  Distillate is highly potent and versatile. It can be used to create marijuana "shatter" or "dabs," and can also be used to create edible and/or topical marijuana products.  When NEZOL referred to "Luke," during the call, NEZOL meant SIROIS, the defendant.  Specifically, NEZOL

and UM4448 were using marijuana supplied by SIROIS to manufacture shatter or distillate (e.g., "it's Luke's stuff.  It will be really nice after the second pass.").  I further believe that when NEZOL described being "paid again" and that Luke was "pumped about everything" that Nezol and UM4448 were doing, NEZOL was indicating that SIROIS had purchased marijuana products from NEZOL, and that SIROIS was excited about the quality of the product that NEZOL was able to manufacture.  I believe that on this call, NEZOL and UM4448 discussed ways to work around Maine state medical marijuana regulations, including by producing shatter or distillate "off the books," (i.e., without fulfilling applicable reporting requirements), and by improperly repurposing certification numbers to fraudulently represent that their products were certified for sale through the medical marijuana program when they were not.

47.     I know from my participation in the investigation that on about March 15, 2020, agents learned from wire intercepts that NEZOL planned to sell marijuana to Co-conspirator-5 ("CC-5") and Co-conspirator-6 ("CC-6"), who intended to travel from New York to Maine to complete the purchase.  After surveilling the drug transaction, and in coordination with the New Hampshire State Police, law enforcement performed a traffic stop in New Hampshire and successfully interdicted approximately four pounds of marijuana from CC-5 and CC-6, who were on their return trip to New York.

48.     I have reviewed additional interceptions over the NEZOL Cellphone that occurred subsequent to the interdiction described above, from which I learned that CC-5 texted NEZOL that she had been pulled over and the marijuana had been seized.  (e.g., Sessions 910, 913-21).  NEZOL texted CC-5 "erase my #" (Session 921).  A few minutes later, NEZOL texted CC-5 "I'm sure somebody just donate it to u.  It must be legit right.  Hope your [sic] okay good luck." (Session 927).

49.    I know from my participation in this investigation and from my review of Maine's medical marijuana regulations that selling marijuana for distribution out of state is not permitted under Maine's regulatory scheme.

50.    On about April 5, 2020, agents intercepted electronic communications over the NEZOL Cellphone between NEZOL and SIROIS, using the SIROIS Cellphone, summarized in relevant part as follows:

| Sender | Receiver | Time | Message Content |
|--------|----------|------|-----------------|
| NEZOL | SIROIS | 10:28 am | Know anyone with outdoor or greenhouse around? |
| NEZOL | SIROIS | 10:29 am | I need a bunch . We could do it through narrow gauge to acouple stores |
| SIROIS | NEZOL | 10:31 am | I will think.  I don't know anyone off hand. What's therough price point goal if its average quality? |
| NEZOL | SIROIS | 10:33 am | No seeds no mold . Any nose at all works. I can dump itfor around 12. So under 1k per unit. Easy flip. |
| NEZOL | SIROIS | 10:35 am | Just no mold or seeds is the only important thing for thestore |
| NEZOL | SIROIS | 10:36 am | Throw up a greenhouse man.  I can help out with that too.Soil water sun. Machine trim. Low overhead . Stores need cheap weed too! |
| SIROIS | NEZOL | 10:42 am | Agreed. I plan on doing around 260 outdoor plants thisspring. |

51.    I believe the text message exchange summarized above is drug related.   I believe that in substance, this text message exchange reflects NEZOL seeking to purchase lower quality, and therefore lower priced, bulk marijuana from SIROIS, in order to be able to sell that marijuana to marijuana store fronts at an anticipated profit of $200 per pound ("I can dump it[ ]for around 12.  So under 1k per unit.  Easy flip").  When NEZOL stated, "Throw up a greenhouse man," I believe that he meant that lower quality marijuana could be grown easily and

cheaply by building a greenhouse, presumably on SIROIS's property.  SIROIS replied that "I plan on doing around 260 outdoor plants this[ ]spring."  I believe SIROIS meant that he intended to cultivate 260 marijuana plants in an outdoor setting during the spring of 2020.

### C.  July 21, 2020 Search and Seizure Operation

52.  On about July 21, 2020, DEA, FBI, IRS and their local law enforcement partners executed approximately 50 search and seizure warrants on a variety of locations and financial accounts associated with the Sirois Organization. I have conferred with members of the investigative team whom I know have conducted an extensive analysis of the Sirois Organization's locations and associates.  Below, and throughout this affidavit, the factual assertions about property records, utility bills, corporation filings, bank account records, and other such information are based on my understanding of work performed by the participating members of the investigative team and my review of their analysis, including the following:

a.  *The Shoe Shop, 374 High Street in Farmington*.  Property records reflect that the Shoe Shop was wholly owned by Sandy River Properties LLC, and corporate records maintained by the Maine Secretary of State reflect that Sandy River Properties was owned 50/50 by SIROIS and COUSINEAU.  Among other things, law enforcement seized in excess of $29,500 in cash, 469 kilograms of processed marijuana, and 1,805 marijuana plants from the Shoe Shop. Subsequently, representative samples of the marijuana seized from the Shoe Shop were analyzed in a DEA laboratory, and these samples were identified as marijuana.

b.  *The Old Toy Factory, 105 Avon Valley Road in Avon*.  Property records reflect that the Old Toy Factory was wholly owned by Spruce Valley LLC and corporate records maintained by the Maine Secretary of State reflect that Spruce Valley was owned 50/50 by SIROIS and CC-1.  Among other things, law enforcement seized in excess of 25 kilograms of

processed marijuana, and 1,189 marijuana plants from the Old Toy Factory. Subsequently, representative samples of the marijuana seized from the Old Toy Factory were analyzed in a DEA laboratory, and these samples were identified as marijuana.

c.    *Western Maine Excavation, 269 Seamon Road in Farmington.* Corporate records reflect that SIROIS was the registered agent for Western Maine Excavation, and that SIROIS was the owner of 269 Seamon Road. Among other things, law enforcement seized in excess of 15 kilograms of processed marijuana, and 646 marijuana plants from the property. Subsequently, representative samples of the marijuana seized from the property were analyzed in a DEA laboratory, and these samples were identified as marijuana.

d.    *497 Federal Row in Industry*. Property records reflect that SIROIS is the owner of 497 Federal Row. Among other things, law enforcement seized in excess of 1.3 kilograms of processed marijuana, and 217 marijuana plants, and eight firearms from the property. Subsequently, representative samples of the marijuana seized from the property were analyzed in a DEA laboratory, and these samples were identified as marijuana.

e.    *42 Village Woods Drive in Rangeley.* Property records reflect that SIROIS is the owner of 42 Village Woods Drive. Among other things, law enforcement seized in excess of 1.1 kilograms of processed marijuana, 320 marijuana plants, 43 vials of marijuana concentrate, and 22 firearms from the property. Subsequently, representative samples of the marijuana seized from the property were analyzed in a DEA laboratory, and these samples were identified as marijuana.

f.    *11 Tate Lane in Windham*. CMP records reflect that DAGNESE was listed as the customer for 11 Tate Lane and provider records associated with the DAGNESE Cellphone indicate that 11 Tate Lane is the address associated with the account. Among other things, law

enforcement seized in excess of 12.6 kilograms of processed marijuana and $40,000 in cash from the property. Subsequently, representative samples of the marijuana seized from the property were analyzed in a DEA laboratory, and these samples were identified as marijuana.

g. *250 Loon Lake Road in Rangeley*. Property records reflect that BURGESS is an owner of 250 Loon Lake Road. Among other things, law enforcement seized in excess of $53,800 in cash from a gun safe at the property.

h. *8 Sunset Lane in Kingfield.* I know from my participation in the investigation that the then-romantic partner of ALISA SIROIS lived at 8 Sunset Lane, and based in part on physical and electronic surveillance, that ALISA SIROIS was residing at 8 Sunset Lane on about July 21, 2020. Among other things, law enforcement seized $267,500 in cash and 15 firearms from the property.

i. *The Homegrown Connection, 407 Wilton Road in Farmington*. Property records reflect that ROBERT SIROIS was the owner of 407 Wilton Road, corporate records reflect that LUCAS SIROIS was the registered agent for Homegrown Connection, and CMP records reflect that ALISA SIROIS was the holder of the account at 407 Wilton Road. Among other things, law enforcement seized in excess of $28,500 in cash and 201 grams of finished marijuana from the property. Subsequently, representative samples of the marijuana seized from the property were analyzed in a DEA laboratory, and these samples were identified as marijuana.

j. *249 Seamon Road in Farmington*. Property records reflect that ROBERT SIROIS was the owner of 249 Seamon Road, and CMP records reflect that ROBERT SIROIS is the account holder for 249 Seamon Road and the LUCAS SIROIS is an authorized party. Among other things, law enforcement seized in excess of $46,400 in cash, 119 marijuana plants, 10.5 kilograms of processed marijuana, and six kilograms of marijuana concentrate from the property.

Subsequently, representative samples of the marijuana seized from the property were analyzed in a DEA laboratory, and these samples were identified as marijuana.

        k.    *The Old Bar, 247 Front Street in Farmington.*  Property records reflect that Front Street Investments LLC is the owner of the Old Bar, and bank records reflect that ROBERT SIROIS is one of three beneficial owners of Front Street Investments.  CMP records show that ALISA SIROIS holds electricity accounts for 2 units of the building, with Front Street Investments as the account holder for the third unit.  Among other things, law enforcement seized in excess of 16.5 kilograms of processed marijuana, and 399 marijuana plants from the property.  Subsequently, representative samples of the marijuana seized from the property were analyzed in a DEA laboratory, and these samples were identified as marijuana.

        l.    *115 Knowlton Corner Road in Farmington.*  Property records reflect that ROBERT SIROIS is the owner of 115 Knowlton Corner Road.  Among other things, law enforcement seized in excess of 44 marijuana plants from the property.  Subsequently, representative samples of the marijuana seized from the property were analyzed in a DEA laboratory, and these samples were identified as marijuana.

## IV.   FINANCIAL CRIMES OF THE SIROIS ORGANIZATION

### A.  Bank Fraud

    53.    I have conferred with a contract financial analyst who works for the U.S. Attorney's Office and a forensic accountant who works for the FBI, who have conducted an extensive financial analysis of bank records and related information concerning the members of the Sirois Organization.  Below, and throughout this Affidavit, when I assert facts about account transaction history, authorized signatories, and similar information, those assertions are based on my understanding of work performed by the financial analyst and forensic accountant and my

review of their working papers (the "Financial Analysis").

54.    Based on my review of the Financial Analysis, I know that the Sirois Organization controlled in excess of 23 bank accounts, the majority of which were held in the names of corporate entities.  From about 2014 through about July 2020, the Sirois Organization moved approximately $13,600,000 in cash through these accounts.  I know from my review of the Financial Analysis, including the books and records of numerous Sirois Organization companies, that the vast majority of this cash represents the proceeds of marijuana trafficking.

55.    I have reviewed Facebook instant messages relating to an account controlled by SIROIS, including messages between SIROIS, SCOVIL, BURGESS, and DOUCETTE sent and received on about March 2, 2020, during which, there was discussion of renewing Maine medical marijuana caregiver cards for members of the Sirois Organization.  Such renewals required payment of administrative fees to the state of Maine.  In that context, the following exchange occurred:

SCOVIL:    Dave [Burgess,] can I get a bank check 1231$ treasurer, state of Maine please

\* \* \*

SIROIS:    Money order is best.  That's a red flag to the bank

SIROIS:    People have lost bank accounts over it.

\* \* \*

BURGESS:    I send extra for slush fund

56.    Based on my training and experience and my involvement in the investigation, I believe that the messages summarized above demonstrate that SIROIS and his coconspirators were concerned about financial institutions learning that their accounts were used in the marijuana business.  Specifically, SIROIS pointed out to SCOVIL, when SCOVIL requested a

bank check from BURGESS (the "business manager" of the Sirois Organization, as discussed above) that a check made out to the Maine state treasury could alert financial institutions (a "red flag") that the account was being used by the Sirois Organization in connection with a marijuana business, and that therefore, a money order (that could be prepared without listing a payee) would be preferable.  SIROIS indicated that this same conduct had caused other individuals in the marijuana business to lose their accounts, when the bank learned of their payment to Maine's treasury ("People have lost bank accounts over it").

57.    I have conferred with the contract financial analyst, from whom I have learned that many compliance officers for financial institutions in the state of Maine are familiar with the licensing fee structure for marijuana businesses; if those compliance officers observe accounts with regular cash deposits in combination with checks written to the treasury in amounts consistent with marijuana licensing fees, they may well conclude that the account is used by a marijuana business and shutter the account.

### a. Lakemont Operating Account

58.    A review of corporate records on file with the Maine Secretary of State, and bank records provided by Bank-1, among other financial institutions, related to corporate accounts controlled by the Sirois Organization reflected that SIROIS and COUSINEAU are co-owners of two corporate entities: Sandy River Properties LLC and Lakemont LLC.  Based on my review of the Financial Analysis, I have learned that Lakemont purports to be the operating company of the Shoe Shop, and that Sandy River Properties purports to be a "landlord," the owner of the facility, that collects "rental income" from Lakemont.

59.    Based on my review of the Financial Analysis, I know that Lakemont's operating account (the "Lakemont Operating Account") is held at Bank-1.  I have reviewed opening

documents associated with the Lakemont Operating Account, including documents dated January 10, 2020, which indicate that LUCAS SIROIS and ALISA SIROIS are signatories for the account and listed as "business owners;" what appear to be the signatures of LUCAS and ALISA SIROIS appear at the bottom of the document. Furthermore, among the Lakemont Operating Account opening documents is an item containing a warranty by the account owners that the account will not be used in connection with a marijuana business. Specifically, the warranty reads:

> I hereby warrant to [Bank-1] that no portion of any proceeds deposited to any account I maintain in any capacity at [Bank-1] will be derived directly or indirectly from any Marijuana-Related Business, or any other illegal activity. "Marijuana-Related Business" means any business that grows, produces, buys or sells or otherwise distributes marijuana (a "Marijuana Business"), a business that leases real property or otherwise provides space to a Marijuana Business, or a business that, to the member, leases or otherwise provides equipment which is directly used to grow or produce marijuana

The warranty on the Lakemont Operating Account opening documents was initialed "L.S." and "A.S." which I understand to be the initials of LUCAS SIROIS and ALISA SIROIS.

60.     Bank-1 personnel informed members of the investigative team that the reason that the warranty described above is present in account opening documents for Bank-1, is that Bank-1 has a policy of not providing banking services to marijuana businesses. Because marijuana trafficking remains a federal crime, Bank-1 refrains from participation in that business, in order to avoid suffering losses as a result of federal law enforcement action, and to insulate Bank-1 from any legal liability for the facilitation of drug trafficking. If a customer cannot warrant that their account will not be used in connection with a marijuana business, Bank-1 will, at a minimum, decline to open the account.

61.     I have reviewed the Financial Analysis, including an accounting of the deposits into the Lakemont Operating Account from about January 19, 2017 through July 21, 2020, from which I have learned that, as relevant here, monies were deposited in aggregate from the following sources and in the following amounts:

| Source | Amount |
|---|---|
| New England Cannabis Consulting LLC | $4000.00 |
| Blue Sky Lab LLC | $8054.00 |
| ERB LLC | $22,500.00 |
| Coast to Coast Medical Extracting LLC | $28,254.67 |
| Homegrown Healthcare of Maine LLC | $36.024.00 |
| Narrow Gauge Distributors, Inc. | $896,231.50 |
| Remedy Compassion Center Inc. | $1,521,339.08 |
| Cash | $4,327,903.00 |

62.     Based on my participation in the investigation, I know that the companies listed above are marijuana businesses, including, as particularly relevant here, Narrow Gauge Distributors, which I know to be a marijuana company co-owned by SIROIS, SCOVIL, DOUCETTE and COUSINEAU, as described in detail above. Further, I know that, among other reasons, because marijuana remains a federally scheduled drug and its trafficking is against federal criminal law, federally insured financial institutions are generally reluctant to provide banking services to marijuana businesses. Therefore, the lion's share of marijuana transactions in Maine are believed to be conducted in cash. Given that Lakemont operated a large marijuana cultivation and distribution business, it is reasonable to conclude that the over $4 million in cash that flowed through the Lakemont Operating Account were marijuana proceeds.

### b. Narrow Gauge Distributors Account

63.     A review of corporate records on file with the Maine Secretary of State, and bank records provided by Bank-1, among other financial institutions, related to corporate accounts controlled by the Sirois Organization, showed that SIROIS, SCOVIL, DOUCETTE, and

COUNSINEAU are co-owners of the corporate entity Narrow Gauge Distributors. As described further above, I know from my participation in the investigation that Narrow Gauge Distributors served as the sales and/or distribution arm of the Sirois Organization, and that SIROIS, SCOVIL and DOUCETTE ultimately hoped to monopolize the marijuana distribution market in Maine ahead of changes to Maine's marijuana laws they hoped would be enacted that would mandate that all marijuana cultivators use a third-party distributor.

64.     Based on my review of the Financial Analysis, I know that the operating account for Narrow Gauge Distributors (the "NGD Operating Account") is held at Bank-1. I have reviewed opening documents associated with the NGD Operating Account, including documents dated September 11, 2019, which indicate that SIROIS, SCOVIL, and DOUCETTE applied to open the account. I have reviewed a business questionnaire reflecting what appear to be the signatures of SIROIS, SCOVIL, and DOUCETTE at the bottom of the document. Furthermore, among the NGD Operating Account opening documents, the same warranty described above for Lakemont, affirming that the account will not be funded with proceeds of a marijuana business, appears initialed by L.S., B.D.S. and D.M.D., which I understand to be the initials of SIROIS, SCOVIL, and DOUCETTE, respectively.

65.     Further, the account opening documents associated with the NGD Operating Account describe the "Purpose/Type/Nature of Business" as "Distribution of beverages and beverage products." I know from my participation in the investigation that the products that NGD actually distributed were marijuana and marijuana-derived products.

66.     I have reviewed the Financial Analysis, including an accounting of the deposits into the NGD Operating Account from about September 11, 2019 through July 21, 2020, from which

I have learned that, as relevant here, monies were deposited in aggregate from the following sources and in the following amounts:

| Source | Amount |
|---|---|
| Maple Valley Pharms LLC | $24,772.50 |
| Central Maine Flower | $24,975.00 |
| Wicked Inc | $26,639.50 |
| Blue Sky Labs, LLC | $29,000.00 |
| Strawberry Fields LLC | $29,262.00 |
| Cport Cashiers Check | $37,750.00 |
| CPORT/Eastern Retail Brokerage | $50,625.00 |
| VCC Inc | $80,147.50 |
| Pharmers Market Care Givers Inc | $97,426.55 |
| Eastern Retail Brokerage LLC | $114,320.00 |
| Earthly Delights of Maine | $201,182.70 |
| Farley Farm LLC | $214,609.00 |
| Remedy Compassion Center Inc. | $229,655.80 |
| Cash | $349,257.00 |

67.     Based on my participation in the investigation, I know that the companies listed above are marijuana businesses.  Furthermore, as detailed above, I believe that the $349,257 in cash that flowed through the NGD Operating Account represents the proceeds of drug sales.

    **c.   Rangeley Internet Company Account**

68.     I have reviewed corporate records on file with the Maine Secretary of State, and bank records provided by Bank-1, among other financial institutions, related to corporate accounts controlled by the Sirois Organization, from which I have learned that DAVID BURGESS and LUCAS SIROIS are co-owners of corporate entity Rangeley Internet Company LLC.  As will be described further below, I know from my participation in the investigation that Rangeley Internet Company served as a vehicle through which SIROIS paid BURGESS in order to induce him to use his position as a Rangeley Selectman to take official action on behalf of the Sirois Organization.

69.    Based on my review of the Financial Analysis, I know that an account used by Rangeley Internet Company (the "Rangeley Internet Account") is held at Bank-1.  I have reviewed opening documents associated with the Rangeley Internet Account, including documents dated October 16, 2019, which indicate that BURGESS, SIROIS, and BURGESS's wife, are signatories for the account and listed as "business owners;" what appear to be the signature of BURGESS appears at the bottom of the document.  Furthermore, among the Rangeley Internet Account opening documents, the same warranty described above, affirming that the account will not be funded with proceeds of a marijuana business, appears initialed by D.B., which I understand to be the initials of BURGESS.

70.    I have reviewed the Financial Analysis, including an accounting of the deposits into the Rangeley Internet Account from about October 16, 2020 through July 21, 2020, from which I have learned that, as relevant here, monies were deposited in aggregate from the following sources and in the following amounts:

| Source | Amount |
|---|---|
| Narrow Gauge Consulting LLC | $25,000.00 |
| Cash | $57,050.00 |

71.    Based on my participation in the investigation and my review of the Financial Analysis, I know that Narrow Gauge Consulting is a corporate entity controlled by LUCAS SIROIS and is funded with the proceeds of drug transactions.  Furthermore, as detailed above, I believe that the $57,050.00 in cash that flowed through the Rangeley Internet Account represents the proceeds of drug sales.

72.    Records relating to Rangeley Internet Company were obtained and analyzed by the contract financial analyst.  Included in those records was a spreadsheet representing the funding of BURGESS's companies, including Rangeley Internet Company, by SIROIS, in an

aggregate amount of $236,665.  The Financial Analysis traced individual payments listed on that spreadsheet, linking them to deposits into various Rangeley Internet Company bank accounts for a total of $230,315.  The $57,050 in cash deposits and $25,000 from Narrow Gauge Consulting described above, were traced back to SIROIS in this way, in addition to the following payments: $6,000 in cash to Burgess Construction & Maintenance account at Bank-1; $134,453 in cash deposits to an account in the name of BURGESS at Bank-2; $7,812 in cash to a Rangeley Internet account at Bank-2.  Regarding the BURGESS account at Bank-2, I have learned that Bank-2 personnel advised BURGESS on March 28, 2018 that they would have to close his account if he continued to deposit cash smelling like marijuana into the account.

**B.  Money Laundering**

73.    I have reviewed the Financial Analysis, among other records, from which I have learned that SIROIS and the Sirois Organization operated through numerous corporate entities and conducted elaborate transactions that involved funneling the proceeds of drug sales through multiple entities.  These transactions were conducted in order to obfuscate the nature and origin of the drug proceeds, as evidenced by, among other things, the complexity of the transactions and the lack of legitimate business purpose attendant to them, as well as misrepresentations made to the Bank-1 about the presence of marijuana proceeds flowing through Sirois Organization accounts.  Below, I describe examples of laundering transactions the investigation has identified.

a.    **Lakemont and Sandy River Properties Layering Scheme**

74.    As detailed above, I know SIROIS and COUSINEAU are co-owners of two corporate entities, Sandy River Properties LLC and Lakemont LLC.  From my review of the Financial Analysis, I have learned that Lakemont purports to be the operating company of the Shoe Shop, and that Sandy River Properties purports to be a "landlord," the owner of the facility,

that collects "rental income" from Lakemont.   In account opening documents on file with Bank-1, SIROIS described Lakemont's business as "real estate management/office staffing/rental and leasing agreements etc."  A subsequent version of the opening questionnaire, completed by SIROIS on March 20, 2019, describes Lakemont as a "Property Management Company, financial management of properties, clean ups, renting."  Sandy River Properties was described as being in the business of "Rental Properties" on its opening documents filed with Bank-1. However, as the investigation revealed, Lakemont and Sandy River Properties were exclusively in the business of marijuana cultivation and distribution.

75.     From my review of the Financial Analysis, I have learned that from about 2016 through about July 2020, Lakemont deposited at least $4,327,903 in cash into the Lakemont Operating Account, the proceeds of Lakemont's marijuana sales.  During the same time period, Sandy River Properties' Bank-1 account received $100 in cash deposits (in 2016).

76.     From January 19, 2017 through July 21, 2020, Lakemont booked approximately $6.8 million in proceeds, much of which it characterized as rent paid to it by individual caregivers who "rented" grow rooms in the Shoe Shop.  In fact, those funds were almost entirely the proceeds of marijuana sales.  As detailed in the Financial Analysis, during this same time period, Lakemont made variable weekly payments to Sandy River Properties that it characterized as "rent," of between $19,000 and $29,000 totaling approximately $4.5 million.  SIROIS and COUSINEAU each took distributions from Sandy River Properties during this time period of approximately $800,000 and $240,000 respectively.

77.     Based on my training and experience, and based on my involvement in the investigation, I believe that the Lakemont/Sandy River Properties structure was designed to obfuscate the source and nature of the drug proceeds that funded the Sirois Organization,

48

because those proceeds were funneled through two corporate entities and mischaracterized as rental payments at each link in the transaction chain. Misrepresentations to Bank-1 by both entities about the nature of their business and the provenance of the funds that flowed through their accounts demonstrate that this structure was very deliberately erected to conceal the origin of the funds. As described in further detail below, the Lakemont income was funneled not only to Sandy River, but to a broader network of Sirois Organization accounts in order to further obscure the nature and source of those proceeds.

### b. **HELOC Account**

78.    I have reviewed the Financial Analysis, which includes an analysis of financial records provided by Bank-2 relating to a home equity line of credit ("HELOC") extended by Bank-2 to SIROIS beginning in or about August 2005. I have learned that the original HELOC line of credit was for $41,000. The collateral securing the HELOC is listed as 497 Federal Row, Industry, Maine. I am familiar with property records maintained by Franklin County, from which I have learned that 497 Federal Row is owned by SIROIS. Bank-2 records relating to the HELOC demonstrate that as of about February 2020, the HELOC remains open. From about 2016 through about February 2020, Bank-2 records reflect that in excess of $570,317 in cash was deposited into the HELOC account. During that same period, records reflect approximately $554,337 in disbursements from the HELOC account to, among other payees, Narrow Gauge Consulting, SIROIS, and substantial mortgage payments to Gimbel Properties, relating to real property at 3155 Main Street, in Rangeley, and Howard Buckley, relating to real property at 116 North Shore Drive, in Industry. I am familiar with records maintained by Franklin County, from which I learned that LUCAS SIROIS and ALISA SIROIS are the owners of 3155 Main Street and 116 North Shore Drive.

79.     Based in part on my conversations with the financial analyst who interpreted these and other relevant records, I believe that SIROIS is employing the HELOC as a laundering mechanism, using cash proceeds from his illegal marijuana business to fund the HELOC account, and then using that account to make various payments, including payments to himself, to companies that he controls, and into real estate that he owns.  I believe that there is no legitimate business reason that SIROIS would keep open a home equity line of credit for approximately 15 years in order to conduct transactions worth approximately 14 times the original loan amount, nearly all in cash.  However, the HELOC is one way for SIROIS to conceal the source and ownership of the drug proceeds which he uses to fund it.

### c.  **Purchase of 3155 Main Street, Rangeley**

80.     I have reviewed the Financial Analysis, which includes analysis of accounts held by LUCAS SIROIS; ALISA SIROIS; LUCAS and ALISA SIROIS; and LUCAS SIROIS and BURGESS, among others, at Bank-1, Bank-2, Bank-3 and Bank-4.  I am familiar with mortgage documents relating to the purchase of 3155 Main Street in Rangeley by LUCAS SIROIS and ALISA SIROIS in about August 2016, which show that LUCAS and ALISA borrowed $300,000 to purchase the property, and that the mortgage was held by Gimbel Properties.  Further, I have learned that the mortgage was discharged on October 2, 2019, and that monthly payments of approximately $9,263 were made in service of the mortgage between about August 2016 and October 2019, through at least seven distinct bank accounts controlled by the Sirois Organization.

81.     Based on my review of bank records corresponding to these seven accounts, I know that all of them were funded in whole or in part with cash: the proceeds of Sirois

Organization drug sales.  Below is a chart summarizing the cash funding of the relevant accounts between 2016 and 2020:

| Account Identifiers | Cash Deposits |
|---|---|
| LUCAS and ALISA SIROIS account ending in 0535 at Bank-3 | $180,490.00 |
| LUCAS SIROIS and DAVID BURGESS account ending in 2714 at Bank-3 | $24,000.00 |
| LUCAS SIROIS account ending in 2612 at Bank-1 | $13,864.13 |
| ALISA SIROIS account ending in 2218 at Bank-1 | $400,015.00 |
| LUCAS SIROIS and ALISA SIROIS account ending in 0913 at Bank-4 | $232,450.00 |
| LUCAS SIROIS and DAVID BURGESS account ending in 0514 at Bank-4 | $32,800.00 |
| HELOC Account held by LUCAS SIROIS | $570,317.99 |

82.    The following chart summarizes total amounts paid on the mortgage across the same seven Sirois Organization accounts:

| Account Identifiers | Payment Amount |
|---|---|
| LUCAS and ALISA SIROIS account ending in 0535 at Bank-3 | $18,526.26 |
| LUCAS SIROIS and DAVID BURGESS account ending in 2714 at Bank-3 | $36,969.56 |
| LUCAS SIROIS account ending in 2612 at Bank-1 | $9,264.00 |
| ALISA SIROIS account ending in 2218 at Bank-1 | $46,315.00 |
| LUCAS SIROIS and ALISA SIROIS account ending in 0913 at Bank-4 | $74,105.00 |
| LUCAS SIROIS and DAVID BURGESS account ending in 0514 at Bank-4 | $18,526.00 |
| HELOC Account held by LUCAS SIROIS | $120,392.82 |

83.    Based in part on my conversations with the financial analyst who interpreted these and other relevant records, I believe that this payment structure utilized by LUCAS SIROIS,

51

ALISA SIROIS and DAVID BURGESS is a laundering mechanism, employing cash proceeds

from the Sirois Organization drug business to fund the purchase of real estate through seven

distinct accounts across four financial institutions, each with different ownership structures.  I

believe that there is no legitimate business reason to explain this manner of satisfying the

mortgage on 3155 Main Street.  However, such a structure would effectively conceal the source

and nature of the proceeds which were used to purchase this asset, by placing at least one

intermediary account between the cash deposits and each payment made on the mortgage pay-

off.

## V. **TAX EVASION**

84.     I know from my participation in the investigation that agents of the IRS

conducted a consensual interview with ALLEN at his office.  From conferring with those agents,

and from reading their reports related to the interview, I know that ALLEN operates a business

in Farmington which offers, among other services, tax preparation services.  SIROIS is

ALLEN's largest client, and pays ALLEN approximately $10,000 per year for his services.

SIROIS effectuates payment in cash delivered by ALISA SIROIS.  ALLEN prepared SIROIS's

tax returns for tax years 2016 through 2019.  Additionally, ALLEN prepared tax returns for

several of the Sirois Organization corporations, including Narrow Gauge Holdings, Maia New

England, and CG Bio-Genomics.

85.     I have reviewed an email message that ALLEN had maintained in his files

relating to services performed for SIROIS.  The message was from an individual I know to work

as a bookkeeper for the Sirois Organization, and was sent to ALLEN on March 12, 2019, subject

line: "Sirois."  The bookkeeper wrote, in part, "Hi Ken, Luke would like to know how we can get

rid of the State of Maine Tax lien, he receives multiple phone calls a day and our PO Box is

packed full of letters from companies trying to help us get the tax paid. I also have the K-1 for

Lakemont LLC and Spruce Valley …"

86.    During the consensual interview of ALLEN, IRS agents showed him the email

described above and asked him about it. ALLEN recalled the email and stated, in substance, that

SIROIS did not want to pay his taxes and often asked ALLEN how to eliminate his tax burden.

ALLEN recalled an in-person meeting with BURGESS in about March or April 2019 consistent

with the email summarized above. ALLEN understood that BURGESS was SIROIS's business

manager and financial advisor. During that meeting BURGESS told ALLEN that SIROIS did

not want to pay approximately $250,000 in federal taxes that he owed from tax year 2017.

ALLEN suggested that by creating fictitious historical transactions that would move money from

SIROIS's profitable businesses to his non-profitable businesses, SIROIS could substantially

reduce the amount of income he would have to report to the IRS, which would in turn reduce or

eliminate his federal tax liability for 2017.

87.    I have reviewed the contents of an email message that ALLEN maintained in his

files written from ALLEN to SIROIS and BURGESS on May 19, 2019, subject line: "Trying to

wrap up 2017 amendment." ALLEN wrote, "Ok, please keep this email between the three of us,

Luke, David and myself:

> Not knowing the complete ins/outs of each entity, can the following
> happen:
>
> 1)    Homegrown either hires CG Bio Genomics or sells
>        products to them.
> 2)    Luke's personal rental business hires Narrow Gauge
>        Holdings for services.
> 3)    Maia purchases material from Homegrown.
> 4)    Narrow Gauge Botanicals purchases material from
>        Homegrown.
> 5)    Are we able to indicate that Homegrown purchased $250-

300k in inventory (be able to get cash receipts from other in event of an audit?)

If ALL 5 above can happen, your entire 2017 liability state and federal will disappear.  If NOT everything above happens, the liability will significantly decrease depending on how many of each items above happens or not.

88.     During the consensual interview of ALLEN, IRS agents showed ALLEN the email summarized above and asked him about it.  ALLEN recalled the email and stated, in substance, that after he sent it, he received confirmation from BURGESS that SIROIS was signed-off on the plan detailed in the email, and instructed ALLEN to prepare an amended tax return for tax year 2017 consistent with the five items delineated in the email.  ALLEN in fact prepared the amended returns consistent with the email, even though there was nothing in SIROIS's books and records to support the adjustments that ALLEN made, because the adjustments were false and were designed to eliminate SIROIS's 2017 tax liability.

89.     I have reviewed the original 2017 federal tax returns for SIROIS and Alisa Merwin (whom I know to be ALISA SIROIS), filed on about October 5, 2018.  Those returns report an income for LUCAS and ALISA SIROIS of $700,964 and taxes and penalties owed to the federal treasury totaling $260,378.   According to the returns, ALLEN prepared and filed them, and LUCAS SIROIS and ALISA SIROIS signed them.  Further, I have reviewed amended 2017 federal tax returns for SIROIS and Alisa Merwin, which were received by the IRS on about July 9, 2019.  The amended returns report an income for LUCAS and ALISA SIROIS of $112,801 and taxes and penalties owed to the federal treasury totaling $17,131.

90.     I have reviewed the contents of an email message that ALLEN maintained in his files relating to SIROIS's 2018 federal tax returns, written by ALLEN to BURGESS on April 20, 2019, subject line: "RE: Luke Sirois."  ALLEN wrote, "Hey David, Two quick issues:

1) Narrow Gauge Holding (a Ccorp, which I think it has to be as a holding company) has a 341k loss, which you can't do anything with … it stays with the company and will eventually offset any profits the company makes over the next 20 years.
   - Narrow Gauge Real Estate shows a $300k profit
   - I wanted NGRE to hire NGH for $300k to offset each other, but I didn't want to interfere with anything that the other individual involved, which is [a second beneficial owner of the Narrow Gauge Holdings], might be doing with this as an officer of that company.  I wasn't sure… maybe he has nothing to do with the company … If Luke is in control, this would be a great way to zero out at least these taxes (maybe 100k! worth) without spending anything!
2) Maia is showing a 75k loss and Homegrown is showing a 100k profit.  I would have Homegrown purchase [the number "$100 is crossed out and the number "150" is hand-written on a print-out copy of the email] from Maia to zero out these taxes (maybe 30k worth) AGAIN, without needing to have to purchase anything. …

Let me know … taxes are looking good this year, but I think we could show some (I'm working on a number this weekend) cogs/purchases from Luke's 100% controlled entities to zero out taxes this year to help clean up previous tax years.

91.     During the consensual interview with ALLEN, IRS agents showed ALLEN the email summarized above and asked him about it.  ALLEN recalled the email and stated that the email detailed ALLEN's plan to create false expenses to reduce income and ultimately offset or eliminate 2018 tax liability for SIROIS.  ALLEN stated that SIROIS's 2018 taxes were discussed at the same in-person meeting with BURGESS where ALLEN proposed filing a fraudulent amended 2017 return.  ALLEN admitted that SIROIS's 2018 returns were also false; specifically that ALLEN had filed a false Schedule C for the Homegrown Connection (a business wholly owned by SIROIS), and a false Schedule E for Narrow Gauge Real Estate (another wholly owned SIROIS business), both consistent with the email summarized above, which detailed false business transactions that did not occur in 2018.

92.    I have reviewed 2018 federal income tax returns filed by ALLEN on behalf of LUCAS SIROIS and ALISA SIROIS, which were received by the IRS on about June 7, 2019, and from which I have learned that the returns reported $87,799 in income, and taxes due and owing to the federal treasury totaling $8,195.  I am familiar with the Financial Analysis of the books and records for Homegrown Connection, LLC, a business wholly owned by SIROIS. According to its books, Homegrown Connection should have booked a profit of $105,659 in 2018.  Instead, on Schedule C of the 2018 tax returns, Homegrown Connection reports a loss of $128,279.  Furthermore, I am familiar with the Financial Analysis of the books and records for Narrow Gauge Real Estate, an entity wholly owned by SIROIS.  According to its books, Narrow Gauge Real Estate should have reported a profit of $314,341.15 for 2018.  Instead, it reported legal expenditures on its tax returns of $308,000 – expenses that do not appear on its books and records – which essentially zero out the 2018 profits for Narrow Gauge Real Estate.  These false expenditures for each of SIROIS's companies are consistent with ALLEN's April 20, 2019 email described above.

93.    I have conferred with the IRS agent and have reviewed his analysis of the true tax liability for tax years 2017 and 2018 for LUCAS SIROIS and ALISA SIROIS, from which I have learned that LUCAS and ALISA SIROIS's true income for tax year 2017 should have been $712,784 (compared to $112,801 actually reported), and their true income for tax year 2018 should have been $674,266 (compared to $87,799 actually reported).  As a result, ALLEN, BURGESS, and SIROIS fraudulently deprived the federal treasury of taxes due and owing of approximately $237,659 for 2017 and $193,736 for 2018.

## VI.  <u>PUBLIC CORRUPTION OFFENSES</u>

### A.  <u>Sirois and Burgess defraud Rangeley citizens of their right to honest services</u>

94.     As discussed in detail above, BURGESS held a managerial role in the Sirois Organization, and was paid weekly by SIROIS to "fix" SIROIS's problems.  However, his weekly salary was not the only profit BURGESS realized from his association with the Sirois Organization.  As detailed further below, between about March 2, 2018 and about July 21, 2020, SIROIS financed BURGESS's start-up company, the Rangeley Internet Company, providing over 84% of its total capital contribution, equal to $224,315.  In exchange, BURGESS advanced SIROIS's interests in his capacity as a Rangeley Selectman, including voting to advance to a referendum a marijuana ordinance that SIROIS himself had authored and that would loosen restrictions on marijuana operations in the town of Rangeley.

95.     I have reviewed publicly available information regarding official actions taken by the Town of Rangeley's Board of Selectmen, to include their published meeting minutes and video recordings of their meetings.  From my review, I have learned the following, among other things:

a.     On March 18, 2019, BURGESS, in his capacity as a Selectman, made a motion to put a marijuana ordinance on the Town's warrant, otherwise known as a ballot, for a popular vote in June.  The motion was accepted, and the Board voted 3-2 to place the marijuana ordinance on the June ballot. BURGESS was one of the three Board members who voted in favor. The marijuana ordinance was later rejected via popular vote in June 2019.

b.     On September 16, 2019, BURGESS, in his capacity as a Selectman, voted against a motion to place a marijuana petition on the June 2020 town ballot.  The Board then voted 1-3 against placing the marijuana petition on the June 2020 town ballot. BURGESS was

one of the three Board members who voted against it.  BURGESS then seconded a motion to accept the marijuana petition and place it on the Town's ballot seven months sooner in November of 2019.  The motion was accepted, and the Board voted 4-1 to accept the marijuana petition and place it on the November ballot; the ballot initiative was later defeated.

   c. At the September 16, 2019 meeting, before voting on the motion to advance the marijuana ordinance to the November 2019 Town ballot as a stand-alone item, a citizen of Rangeley in attendance requested that each of the Town Selectmen answer on the record whether or not they had a conflict of interest as to the impending vote.  In response, each of the Selectman affirmed that they did not have a conflict of interest, including BURGESS.

  96. I have reviewed the Town of Rangeley's Code of Ethic and Conduct For Employees, Elected, and Appointed Officials, including a section of the policy entitled "Conflict of Interest" which states, in relevant part:

> In order to assure their independence and impartiality on behalf of the common good and compliance with conflict of interest laws, members shall use their best efforts to refrain from creating an appearance of impropriety in their actions and decisions.  Members shall not use their official positions to influence government decisions in which they have [(a)] a material financial interest, (b) an organizational responsibility or personal relationship which may give the appearance of a conflict of interest, or (c) a strong personal bias.  A member who has a potential conflict of interest regarding a particular decision shall disclose the matter to the Town Manager and reasonably cooperate with the Town Attorney to analyze the potential conflict.

I have further reviewed documents on file with the Town of Rangeley, from which I have learned that BURGESS affirmed the Town Code of Ethics, including the Conflict of Interest provisions, on at least four separate occasions, including on July 5, 2016, July 16, 2018, July 1, 2019 and July 20, 2020.

97.    I know from my participation in the investigation that a diligent search of the records of the Town of Rangeley has been performed, and there is no evidence that BURGESS ever disclosed his employment with the Sirois Organization, his financial relationship with SIROIS in the Rangeley Internet Company, or any other aspect of his personal and professional relationship with SIROIS to the Town of Rangeley.  I am informed by an agent who conducted a consensual interview with the Rangeley Town Manager, that, among other things, BURGESS did not disclose any conflict of interest to the Town Manager.

98.    I have been informed about the contents of several consensual interviews with an individual who is active in local politics in Rangeley, Maine ("CW-2") conducted by law enforcement personnel.  CW-2 has no criminal history.  CW-2's placement within the Rangeley community allows for frequent and routine access to public officials involved in Rangeley's town government.  CW-2 has informed law enforcement personnel that CW-2 holds a strong belief in a fair and representative local government, and CW-2 has concerns that local government officials are being unduly influenced by members of Maine's marijuana industry.  CW-2's information has been deemed reliable, and has been independently corroborated by financial records, police reports, telephone analysis, and public records, including public meeting notes and other sources of public information.  From my debrief with the agents who interviewed CW-2, as well as from my review of reports memorializing those interviews, I have learned, among other things, the following about BURGESS and SIROIS:

a.    BURGESS is a proponent of the legalization of marijuana and marijuana businesses, and in his capacity as Selectman of Rangeley, often proposes or seconds motions that would have the effect of relaxing zoning and other restrictions to permit the operation of marijuana businesses within the Town of Rangeley.  When the opportunity to vote on these

proposals arises, BURGESS consistently votes in order to relax restrictions on marijuana businesses.

b.    CW-2 was informed by another individual who is also active in local politics, and who opposes the expansion of marijuana businesses into Rangeley ("Citizen-1"),[7] that in about October 2019, prior to the November 2019 referendum described above, LUCAS SIROIS told Citizen-1, in sum and substance, that "I should just buy you a truck and get you on my side."

99.    Based on interviews with CW-2, and based on my participation in the investigation, I understand that this voting pattern reflects BURGESS's intention to expedite the expansion of marijuana business within the Town of Rangeley.  As I learned from CW-2, after the town rejected the marijuana ordinance in June 2019, the normal process would have been for the new proposed ordinance to be considered for a vote by the town in June 2020 along with other town business, in order to be fully considered with an open process.  Instead, BURGESS pushed for the ballot initiative to be considered as a stand-alone item in November 2019, which efforts by BURGESS were successful.  However, the town ultimately rejected the marijuana ordinance in November 2019.

100.    Citizen-1 provided members of law enforcement with screenshots of a Facebook Messenger conversation between Citizen-1 and SIROIS, who I believe was using the SIROIS Cellphone, appearing to be dated on March 26, 2019.  The following is a summary of relevant portions of the exchange between SIROIS and Citizen-1:

---

[7]    Citizen-1 is not formally cooperating with the Investigation.  Citizen-1's information was provided to the Investigation by CW-2, including, as discussed below, screenshots of a text message exchange between Citizen-1 and LUCAS SIROIS, which corroborate Citizen-1's statements to CW-2.  Citizen-1 has no criminal history.  Citizen-1's statements have been deemed reliable.

| | |
|---|---|
| SIROIS: | So, hopefully the Rangeley vote will be affirmative. It has nothing to do with someone's opinion of using marijuana. It's a business and zoning location issue now. |
| Citizen-1: | Why don't you and David Burgess disclose your business interest then? |
| SIROIS: | Because we haven't finalized anything. I'm just showing you there is more support than you realize. |
| Citizen-1: | I know how much support there is Luke. You'll find out when people are voting and can't be intimidated by you[.] |
| SIROIS: | It's not intimidation. I have no idea where you get that. It's education for sure though… |
| *** | |
| Citizen-1: | As to Burgess. I thought you already were in business together? Didn't you find his Rangeley Internet project?

*fund |
| SIROIS: | I did. What does that have to do with the cannabis stuff? 2 separate topics. He has no ownership or stakeholder status in the cannabis business. |
| Citizen-1: | Not under the rules of conflict of interest. Thanks for the info[.] |
| SIROIS: | This isn't a Luke Sirois issue . . it's a town issue so good luck with that. |

101.    Based on my training and experience, and on my involvement in the investigation, I believe that in this exchange, Citizen-1 and SIROIS discussed the then-upcoming referendum in the Town of Rangeley. In the exchange, Citizen-1 asked why SIROIS and BURGESS did not disclose their financial arrangements, because Citizen-1 believed that BURGESS should not be voting on legislation which would improve BURGESS's financial condition. Citizen-1 further asked whether SIROIS had funded BURGESS's internet start-up company, the Rangeley Internet Company. SIROIS replied that he did fund the internet company, but falsely asserted that BURGESS held no interest in SIROIS's marijuana businesses.

61

Citizen-1 nevertheless indicated that Citizen-1 believed that the non-disclosure of SIROIS's and BURGESS's shared financial interest in the Rangeley Internet Company violated conflict of interest rules. It appears from the text message exchange above that Citizen-1 believed that non-disclosure to the public was deceitful.

102.    I have reviewed Facebook instant messages chats between SIROIS and BURGESS, which I received in search warrant returns provided by Facebook, from which I learned the following, in substance and in part:

a.      On about February 13, 2019, SIROIS sent BURGESS an excerpt from a Centralmaine.com article relating to the Farmington town marijuana ordinance, which was then before the town counsel. The article stated, in relevant part, that "Luke Sirois, who owns Narrow Gauge Botanicals, said he worked with the town on developing the ordinance and thinks it is fair."

b.      On about October 2, 2019, SIROIS sent BURGESS an image that depicted the following language "Vote Yes on Ordinance Opt-In and Locally Regulate Cannabis Businesses in Rangeley November 5th". BURGESS replied, "Nice[.]" SIROIS wrote, "What's your opinion on the leaves?" BURGESS responded, "I would probably not use them[.]" SIROIS wrote, "Everything but the leaves ok?" BURGESS replied, "Yea[.]"

c.      On about October 22, 2019, BURGESS sent SIROIS images of a mailer entitled "Vote No on Local Ordinance," urging Rangeley voters to reject SIROIS's marijuana ordinance. Among other things, the mailer states in relevant part,

> A similar question was rejected by the voters this past June – less than six months ago. The rejected ordinance was created by the town Ordinance Committee, was subject to three public hearings and two workshops, and was over a year in the making. The ordinance now being proposed was created by a single individual without input from opposing views and with no opportunity for

> public input except for one hearing where no changes were
> allowed to be made.  Essentially we now have an ordinance created
> by an individual and put forward by a petition process effectively
> bypassing the ordinance committee and the public hearing process.

Based on my involvement in the investigation, and based on my review of this and other Facebook messages between SIROIS and BURGESS, I know that SIROIS is the individual referred to here who drafted the ultimate version of the marijuana ordinance that BURGESS voted to advance to a town referendum at the September 16, 2019 meeting described above. SIROIS responded to BURGESS, "Ours is much better[.]"

    d.    On about November 1, 2019, SIROIS sent BURGESS a message asking "Do you have the ability to quietly lobby 15 to 20 people up here to go vote in support of the yes vote?  And maybe Deena also?"  BURGESS replied, "We've been spreading the word[.]  What are you hearing?"  SIROIS wrote, "Haven't heard a lot … I just know we won't win if people don't go vote even though they support it.  Load up a bus with like 50 of them!  You can do it!"

    103.    Based on my review of the Financial Analysis, including an analysis of bank records obtained from Bank-1 relating to BURGESS and SIROIS, I have learned the following, among other things:

    a.    Account opening documents reflect that on about October 16, 2019, an account was opened at Bank-1 in the name of Rangeley Internet Company, LLC.  The account's three signatories were listed as SIROIS, BURGESS, and BURGESS's wife.

    b.    The account opening file contained an operating agreement for the Rangeley Internet Company, LLC, which identified both BURGESSs and SIROIS as members.

    c.    As discussed above, BURGESS signed and initialed these account opening documents, and affirmed that the Rangeley Internet Company account would not contain proceeds of marijuana related businesses.

   d.  Between October 16, 2019 and July 21, 2020, $57,150 in cash was deposited into the Rangeley Internet Company account. Additionally, on about October 16, 2019, a deposit of $25,000 was made by Narrow Gauge Consulting, LLC.[8]

   e.  Account opening documents reflect that on or about October 16, 2019, an account was opened at Bank-1 in the name of Burgess Construction & Maintenance. The account's authorized signatories are listed as BURGESS and BURGESS's wife.

   f.  Between October 16, 2019 and June 9, 2020, $153,060 in cash was deposited into the Burgess Construction & Maintenance account. That figure represents the total deposits made into this account during the lifetime of the account through June 9, 2020.

  104. Based on my review of the Financial Analysis, including an analysis of bank records obtained from Bank-3 and Bank-4 relating to BURGESS and SIROIS, I have learned, among other things, that (i) on about October 24, 2019, BURGESS was added as an authorized signatory on an account held at Bank-3 opened by SIROIS; and (ii) on about October 11, 2019, BURGESS was added as an authorized signatory on an account held at Bank-4 opened by SIROIS.

  105. Based on my review of the Financial Analysis, including an analysis of bank records obtained from Bank-2 relating to an account whose signatory is BURGESS, I have learned, among other things, the following:

   a.  In March of 2018, a personal account was opened at Bank-2 in the name of BURGESS, with BURGESS as the signatory. Between the account opening and October 15, 2019, approximately $134,153.94 in cash was deposited in the account. Each cash deposit

---

[8] I am familiar with records maintained by the Maine Secretary of State relating to Narrow Gauge Consulting, LLC, from which I have learned that LUCAS SIROIS is the beneficial owner of Narrow Gauge Consulting.

comprising that total was under $10,000. Among this total, the following cash deposits were made after June 30, 2019: $2,000 deposited on July 1, 2019; $5,000 deposited on August 2, 2019; $5,000 deposited on August 5, 2019; $5,000 deposited on August 29, 2019; $5,000 deposited on September 6, 2019; $5,000 deposited on September 12, 2019; $1,000 deposited on September 30, 2019; and $1,000 deposited on October 15, 2019.

106.    In summary, based on my review of the Financial Analysis, I have identified three accounts associated with Rangeley Internet Company, LLC. Across these three accounts, between about March 2, 2018 and July 21, 2020, SIROIS deposited cash, and directed payment by entities he controls (e.g., Narrow Gauge Consulting) totaling $224,315. Other deposits across the three accounts total $42,500 for the same time period—about 16% of the total.

107.    It should be noted that the Rangeley Internet Company account held at Bank-1 was opened on October 16, 2019, approximately one month after BURGESS voted to advance SIROIS's marijuana ordinance to a town referendum, and approximately one month before the actual town vote, during which time, as detailed above, BURGESS was involved in assisting SIROIS with his lobbying efforts designed to pass the ordinance.

## B.  SIROIS, SCOVIL, DOUCETTE and MCLAMB defraud Maine citizens of their right to honest services

108.    I have reviewed Facebook instant messages between SIROIS, SCOVIL, and DOUCETTE, which show that they were discussing forming a marijuana company together as early as about June 2019. At that time, I know from my examination of employment records maintained by the Franklin County Sheriff's Office, that SCOVIL and DOUCETTE were then-employed as Deputy Sheriffs, and that their employment continued until they resigned on about November 25, 2019. I know from my review of records on file with the Maine secretary of state that Narrow Gauge Distributors was incorporated on about July 24, 2019. I know from my

review of records maintained by Bank-1 that NGD's corporate bank account was opened on about September 11, 2019, and that SIROIS, SCOVIL and DOUCETTE signed and initialed the opening documents, and are listed as owners and authorized signatories on the account.

109.    I have reviewed a copy of the FBI's Criminal Justice Information Services Security Addendum (the "Addendum"), which details the duties and responsibilities of law enforcement officers who access Criminal History Record Information and Related Information through the National Crime Information Center ("NCIC").  From my review, I have learned that "accessing [NCIC records] for an improper purpose; using, disseminating or re-disseminating information received [from NCIC] for a purpose other than" an official law enforcement purpose, may subject the violator to administrative or criminal penalties.  I am informed by a member of the Maine State Police who serves as an FBI liaison that all law enforcement officers in the State of Maine who are certified as end users of any system that interfaces with NCIC would have received instruction consistent with the Addendum in a mandatory training course run by the State Police.  I am further informed that the law enforcement databases utilized by SCOVIL and DOUCETTE would have interacted through interstate electronic wire communications with NCIC systems, which are housed in West Virginia.

110.    I have reviewed documents on file with the Maine State Police relating to NCIC training.  In particular, I have reviewed certification certificates relating to the NCIC system which indicate that the bearer of the certificate has completed training required to access the system.  From my review I have learned that SCOVIL, DOUCETTE, MCLAMB and LEMAY have all completed NCIC training requirements.

111.    As described further below, I believe that SCOVIL, DOUCETTE, and MCLAMB each violated their duty to maintain sensitive, confidential law enforcement information by

running inquiries through law enforcement databases, including the NCIC system, in order to

gather confidential law enforcement information that they disseminated to SIROIS or his

associates to use to for his benefit. SCOVIL and DOUCETTE did so in exchange for an interest

in, and employment with, the Sirois Organization. Similarly, MCLAMB provided sensitive

confidential information to DOUCETTE for the benefit of the Sirois Organization in violation of

his duty to maintain it, in exchange for the promise of employment at an illegal marijuana grow,

and a ready-made sales pipeline to the Sirois Organization.

### a. SCOVIL and DOUCETTE provide law enforcement confidential information to SIROIS

112.    I have reviewed Facebook messages between SIROIS, SCOVIL, and

DOUCETTE sent and received on about August 28, 2019 which can be summarized as follows:

| | |
|---|---|
| SCOVIL: | Cops lying in reports, lying on the stand. They refuse to address the problem. They were talking about you moving shit in u-haul trucks. I was like umm it's prob Lisa moving shit out idiots. They are all crooked as fucked. I got sat down today and was told I'm negative etc. Meanwhile they have people violating ppls rights and not even caring. |
| DOUCETTE: | Ya place is a fucking joke. And I can't stand them. [Individual] pulled his gun out during a domestic with his wife, never held accountable oh got a week unpaid? Big deal. [Individual] selling county property to other agency's as long as they purchased a dog from his own business. And talking shit about you luke is the point that is bullshit. I can't fucking WAIT until NGD starts up. I will no lie send my shit on a collins wrecker. Fuck them I'll have koob drive down and bill the sheriff's office. |
| SIROIS: | Holy shit…wtf. Talk about a wrong guess. I don't have enough weed to put in a uhaul … nothing better to talk about…. My name just randomly got brought up out of the blue? |
| DOUCETTE: | They are a bunch of fucks dude. With nothing better to do then gossip |
| SIROIS: | I will schedule a time to get the bank account established next week. |

113.    I know based on my training and experience, and from my participation in this investigation, that the messages described above show that SCOVIL and DOUCETTE served as useful sources of information about law enforcement activities that concerned SIROIS.  The messages also show an early dynamic between SCOVIL, DOUCETTE and SIROIS that persisted throughout the relevant time period—where SCOVIL and DOUCETTE were rewarded by SIROIS for sharing information they learned in the course of their law enforcement duties. SCOVIL reported information back to SIROIS that he had learned in the course of his law enforcement duties, namely that "they" (believed to be SCOVIL's fellow law-enforcement officers) were talking about SIROIS moving marijuana around in a Uhaul truck.  SIROIS followed up by asking "my name just randomly get brought up out of the blue?"  Here, SIROIS was asking whether there was an ongoing law enforcement investigation into him that SCOVIL might have known about.  SCOVIL confirmed to SIROIS that there wasn't, and that the other officers were gossiping.  Thereafter, SIROIS promised to open the NGD bank account the following week (in fact it was opened on September 11, 2019, approximately a week after this message exchange).

114.    I have reviewed records on file with the Franklin County Sheriff's Office relating to an NCIC query made September 23, 2019.  From the records, I have learned that SCOVIL performed the query at about 9:58 am, and entered license plate information related to SIROIS, including his registration number.  The query pulled back information about the vehicle used by SIROIS, his license and registration, including his registration address, among other information. I have learned from the custodian of these records at the Franklin County Sheriff's Office that there was no call for service or other official police reports associated with this NCIC query. Based on my training and experience, I have concluded that SCOVIL ran this NCIC query in

order to find out information about SIROIS, including whether and to what extent there were law enforcement records relating to SIROIS, and not for any legitimate law enforcement purpose.

115.    I have reviewed Facebook messages between SIROIS, SCOVIL, and DOUCETTE sent and received on about October 7, 2019 which can be summarized as follows:

SCOVIL:     Hope this picks up and our employee cards come in.  Fishy shit is going on at work we might not have a job come tomorrow hope we can turn enough product ASAP to employee two more luke

SCOVIL:     serious they are on to us.  Someone typed a report one of the days we were at the shoe shop, locked it, and we can't read it or see what it's about but they tagged your name in it.  It is only a matter of time before they haul us in and see what the deal is.

SIROIS:     Interesting… someone must have recognized your vehicles…

SCOVIL:     Maybe?  We check our own names periodically to see if people are looking us up, you up, running our plates, etc.

116.    I know based on my training and experience, and from my participation in the investigation, that the messages summarized above relate to continued unauthorized accesses by SCOVIL and DOUCETTE made in order to benefit SIROIS and the Sirois Organization. Specifically, SCOVIL states that he and DOUCETTE periodically query their own names, SIROIS's name, and their license plate information through law enforcement databases, including the NCIC system, in order to determine if there are any law enforcement investigations or reports relating to the Sirois Organization ("to see if people are looking us up").   SCOVIL also informed SIROIS about a locked report that SCOVIL could not access.

117.    During the course of the investigation, a number of the defendants' electronic devices, including cellular phones, were seized and searched pursuant to judicially authorized search warrants.  Such a search of the cellular phone belonging to SCOVIL (the "SCOVIL Cellphone") revealed a photograph captured by the SCOVIL Cellphone on October 8, 2019,

depicting a law enforcement confidential document entitled "Field Interview Report" appearing on what seems to be a law enforcement computer monitor. The document depicts a transcribed electronic message conversation between SIROIS and an individual known to me who has cooperated with law enforcement in the past. The document pertains to a law enforcement investigation of SIROIS and contains a recommendation that its contents be forwarded to U.S. DEA Agent Harry Tideswell, one of the lead law enforcement agents investigating the Sirois Organization. I know from interviews with personnel at the Franklin County Sheriff's Office that SCOVIL was not assigned to any investigation involving SIROIS in October 2019; as a result, there is no legitimate law enforcement purpose justifying SCOVIL's access to this report.

118.    I have reviewed Facebook messages between SIROIS, SCOVIL, and DOUCETTE sent and received on about November 8, 2019, which can be summarized as follows:

DOUCETTE:    There was another comment about money on how something needed to be paid and dave said oh I'll just take it from Luke's personal account like no? Luke has a personal account for that reason it's his personal bank account so he can spend that money on himself and his family we don't need people dipping into an account without Luke's consent. [BRADLEY,] what was that conversation about you were also there for that one lol

SCOVIL:    We were talking about getting money into our account for payroll. Dave said that he would make sure money was in there even if he had to take it from Luke's personal account. I was like we are all set. We don't want financial backing. We want to slowly earn enough money to be self sufficient even if it takes 6-8 months before we have 3-400k in there to buy and sell all our own stuff. It's just scary that he has that control. And the comments about "Luke has no idea how much money he has or where it is" that scares me and tells me he is taking advantage of you. I wouldn't be so concerned if he has successful business history. But when I put his name into "clear" (one of my work programs) and see he has changed his business name 20+ times. Had vehicles repo'd. Just raised concern. Dave might be a good person. Awesome listener. A guy to bounce ideas off of. But I won't be putting him around money or my financial information. I'll kill him if I find out he is stealing from

70

me. Weed or not he will sit in franklin county and I'll type the press release. The number one people get fired from accounting jobs is because they pad their own pocket and know how to hide it … how does one loose their truck and then pay 13k cash for a sled last month… it doesn't add up. Again, you can make your own decision Luke and we will support you. I will walk with you to the cliff but I might not jump in that situation.

SIROIS:        It's becoming obvious to me that Dave may not be who I think he is. I'm curios on the details on what you guys found on him. Even Lisa said last week not to trust Dave. She said it to 2 of her friends… I fucking just want everyone in that building to be trustworthy and happy… Time to clear the pallet!

119.    Based on my training and experience and my involvement in the investigation, I believe that the messages summarized above are a conversation about the management of the Sirois Organization, and specifically about BURGESS's position as SIROIS's "business manager." In the first message, DOUCETTE takes issue with BURGESS's suggestion that BURGESS could access SIROIS's personal account in order to pay a business expense. SCOVIL expands on the point, first describing how BURGESS had offered to fund payroll for Sirois Organization employees with funds from SIROIS's personal account. SCOVIL informed BURGESS that he and DOUCETTE wanted to be self-sufficient, meaning that they wanted to generate funds through operation of NGD over time, rather than having BURGESS fund their operations with SIROIS's personal funds. SCOVIL then informed SIROIS that he suspected that BURGESS might be stealing from SIROIS, in part because SCOVIL had run BURGESS's identifiers through CLEAR, a law enforcement database that aggregates personal financial and other information for use by law enforcement. From CLEAR, SCOVIL learned that BURGESS had frequently changed his business name and that he had recently had an automobile repossessed. SIROIS is apparently impressed by the information, asks for further details, and states that BURGESS "may not be who I think he is."

71

120.    I have reviewed Facebook messages between SIROIS, SCOVIL, and DOUCETTE sent and received on about November 12, 2019, during which exchange, SIROIS, SCOVIL and DOUCETTE discussed CW-1's position within the Sirois Organization and complained that CW-1, who was in part responsible for sales, could not drive to various customer locations because they claimed that their license had been suspended.  DOUCETTE attached a photograph of what appears to be a law enforcement computer monitor showing NCIC information relating to CW-1, including information about their criminal record and current driver's license information.  DOUCETTE wrote, "[CW-1] could have went valid 10.17.19 wtf lets go[.]"  SCOVIL responded, "If [CW-1] is eligible why isn't [CW-1] paying [CW-1's] reinstatement fee and getting a fucking license back it's like $50[.]"  SIROIS wrote, "Hmm … I will ask [CW-1.]"

121.    I know based on my participation in this investigation, and based on information that has been provided to me by the Franklin County Sheriff's Office, that DOUCETTE was not assigned to any investigation in November 2019 concerning CW-1, and that therefore, there is no legitimate law enforcement purpose for the NCIC query depicted in the photograph DOUCETTE sent to SCOVIL and SIROIS.  Furthermore, I know that utilizing the NCIC system in order to determine the driver's license status of a member of the Sirois Organization, and using that information to assist in making management decisions relating to the operations of the Sirois Organization, is not an authorized use of the NCIC system.

122.    I have reviewed records of CLEAR database queries provided by CLEAR associated with user SCOVIL from December 5, 2019, from which I have learned that SCOVIL queried another member of the SIROIS family who law enforcement believes has worked at the Shoe Shop, using their first and last name as identifiers, among other information.  I know that

72

SCOVIL resigned his position with the Franklin County Sheriff's Office on November 25, 2019, and so this access was unauthorized and was performed without any legitimate law enforcement purpose.

### b. SIROIS provides value to SCOVIL and DOUCETTE in exchange for law enforcement confidential information

123.    I have reviewed documents relating to the purchase of two 2020 White Ford Explorers from a Ford dealership known to me (the "Ford Dealership") on about October 17, 2019.  According to these records, each of the Ford Explorers was purchased by Maia USA Inc., a corporation I know to be controlled by SIROIS.  The co-buyer listed for each of the Ford Explorers was SIROIS.  The purchase price for each of the Ford Explorers was, respectively, $45,499.23 and $45,578.23.  According to the documents, SIROIS put $4,999 in cash down on one Ford Explorer, and $5,000 in cash down on the second Ford Explorer.

124.    I know from my participation in this investigation that SCOVIL and DOUCETTE registered these vehicles as their own and drove them from about October 17, 2019 through at least July 21, 2020.  I have reviewed BMV records that reflect the same. I am familiar with numerous law enforcement surveillance operations during which both SCOVIL and DOUCETTE were observed driving these vehicles during the spring and summer of 2020.  It should again be noted here that SCOVIL and DOUCETTE left the Franklin County Sheriff's Office on November 25, 2019, meaning that SIROIS purchased these vehicles for SCOVIL and DOUCETTE while they were still working as a Deputy Sheriffs.

125.    I have reviewed the Financial Analysis,from which I have learned the following in substance and in part:

a.    On about October 15, 2019, SCOVIL wrote himself a check for $600 from the NGD Operating Account held at Bank-1.  The memo line of the check reads "Expo-Business

Cards."

      b.     On about November 7, 2019, SCOVIL wrote himself a check for $3,009 from the NGD Operating Account. The memo line of the check reads "Mac/Veh Insurance."

      c.     On about December 2, 2019, SCOVIL wrote himself a check for $1,550 from the NGD Operating Account. The memo line of the check reads "Mac/Lock/Cam/Tolls."

      d.     On about December 10, 2019, SCOVIL wrote himself a check for $4,000 from the NGD Operating Account. The memo line of the check reads "December Wages."

126.    Based in part on the Financial Analysis, my training and experience, and my involvement in the investigation, I believe that the disbursements described above represent payments to SCOVIL from the Sirois Organization; specifically, three of these checks are reimbursements for out-of-pocket expenditures made by SCOVIL (two of which occurred while he was still employed at the Franklin County Sheriff's Office). The final disbursement is characterized as "wages" for his work in December. I also know from the Financial Analysis that all of these disbursements were funded by SIROIS. It should again be noted here that SCOVIL and DOUCETTE left the Franklin County Sheriff's Office on November 25, 2019, meaning that at least two of these disbursements occurred while SCOVIL was still working as a Deputy Sheriff.

127.    I have reviewed activity in the NGD Operating account as depicted in the Financial Analysis, from which I have learned that between December 2019 and July 2020, DOUCETTE and SCOVIL were each paid $59,315.21 by the Sirois Organization, and that these payments were all funded by drug proceeds.

### c.   MCLAMB provides confidential information to DOUCETTE for SIROIS's benefit in exchange for the promise of employment in the marijuana industry

128.   I know from my participation in the investigation that at some point in the late spring and early summer of 2020, members of the Sirois Organization, including SCOVIL, DOUCETTE, and SIROIS became concerned that they were being investigated by law enforcement.  As described in further detail below, SCOVIL and DOUCETTE observed law enforcement vehicles surveilling them, and were able to capture license plate information relating to those vehicles.  Beginning in about April 2020, SCOVIL and DOUCETTE began contacting current members of law enforcement with whom they had personal relationships stemming from their time at the Franklin County Sheriff's Office in an effort to leverage those relationships to acquire law enforcement confidential information, including specifically the identity of their investigators.  These contacts included LEMAY, ALVES, and MCLAMB.

129.   I know from my review of personnel records at the Oxford County Sheriff's Office that MCLAMB, the defendant, was employed as an Oxford County Deputy Sheriff in about the summer of 2020.  I have reviewed electronic message communications between MCLAMB and DOUCETTE, from which I have learned that MCLAMB and DOUCETTE were friendly with each other.  I have reviewed text messages sent and received on about June 25, 2020, which can be summarized as follows:

| | |
|---|---|
| DOUCETTE: | Lmao come with work us fuck it |
| MCLAMB: | Doing what.  I can't make less than 70 k |
| DOUCETTE: | Gotta get you growing |
| MCLAMB: | Joe's dad cannot get the permit and license because he technically runs a security company out of the same house for the state denied him … so now we're back at square one. |
| DOUCETTE: | You can always grow and say fuck the state |

| MCLAMB: | And sell to who … you can't buy it because it's not permitted grow or licensed |
| DOUCETTE: | I could pretend I grew it for all I give a fuck |
| MCLAMB: | True I guess |

130.    I know based on my training and experience and from my participation in the investigation that the messages summarized above reflect DOUCETTE offering to assist MCLAMB in entering the marijuana business.  Specifically, DOUCETTE offers to "get [MCLAMB] growing" marijuana.  MCLAMB responds that he has pursued obtaining a caregiver card from the state of Maine, but that the state declined to extend such a card because a security company was being run out of the proposed grow location.  DOUCETTE responded that "you can always grow [marijuana] and say fuck the state," meaning that MCLAMB could begin growing marijuana outside of the auspices of the state program.  MCLAMB wrote that he would be concerned about doing that because there would be no legitimate way to sell his crop. DOUCETTE assured MCLAMB that DOUCETTE could purchase it and "pretend I grew it[.]"  I believe that this exchange indicates both that DOUCETTE is comfortable operating outside of the auspices of Maine's medical marijuana law, as demonstrated at length above, and that he would be willing to assist MCLAMB in operating and profiting from an illegal marijuana grow.

131.    I have reviewed text messages sent and received on about July 6, 2020, which can be summarized as follows:

| DOUCETTE: | Dude just a simple little garage will do just fine doesn't have to be anything crazy you and joe could pull off a garage easy |
| MCLAMB: | We have been looking but there's nothing we can find |
| DOUCETTE: | Damn dude I been keeping my eye open too |
| MCLAMB: | Get that other building and we'll grow there for you haha |

DOUCETTE:          I'm trying to pull some strings

MCLAMB:            Like what haha

DOUCETTE:          Like tryna find you a location

MCLAMB:            Fuck ya

132.    I know from my training and experience and from my participation in the investigation that the messages described above reflect a continuing conversation between DOUCETTE and MCLAMB wherein DOUCETTE is offering to assist MCLAMB in standing up an illegal marijuana grow location.  DOUCETTE observes that MCLAMB and "joe" could set up a marijuana grow in a garage, and that DOUCETTE has been looking out for a suitable location for MCLAMB to cultivate marijuana.  MCLAMB writes that he has also been looking for a location, but has not had success.  MCLAMB suggests that DOUCETTE get "that other building" (meaning that DOUCETTE should purchase a building the two have previously discussed) and that MCLAMB could then grow marijuana at that building for DOUCETTE (and the Sirois Organization).  DOUCETTE writes that he is trying to find MCLAMB a suitable location, to which MCLAMB exclaims "Fuck ya" demonstrating his enthusiasm for the idea.

133.    I have reviewed text messages sent and received the next day, on about July 7, 2020, which can be summarized as follows:

DOUCETTE:          8073PN.  Try like 8071PN or some shit so we can narrow down
                   what town it's coming from.

MCLAMB:            I just ran that 28 as ZZ all plates in Maine and it came back
                   registered to an inactive Chevy impala out of Augusta to Public
                   Safety

DOUCETTE:          Lol wonder which agency at least you figure it out!!! Lmao

MCLAMB:            Maybe someone registered to the academy or DHHS/State Police
                   offices

77

DOUCETTE:        Yeah true probably the state doing some sort of shit creeping around…. Well find out who it is I'm sure

DOUCETTE:        2872 vm was the first one following him I bet that's the same office then

MCLAMB:          Ill look it up

DOUCETTE:        Liked "I'll look it up"

MCLAMB:          That one doesn't even come back on file with anything…. Not even when I run all plates

DOUCETTE:        Weird

134.    I know from my training and experience and from my participation in the investigation that the messages described above reflect DOUCETTE providing MCLAMB with license plate information gathered from the vehicles that were surveilling SCOVIL and DOUCETTE, and MCLAMB using the NCIC system to query those plates.  I know that running a plate "ZZ" is police terminology for a license plate query that seeks a broad scope of data revealing current and previous vehicle registrants.  MCLAMB reported to DOUCETTE that when he had queried the license plate through the NCIC system, the information that was returned indicated that the license plate was issued to "Public Safety."  I know that information indicates that the license plate was issued to one of several law enforcement agencies.

135.    I have reviewed data preserved by the Oxford County Sheriff's Office relating to use of the NCIC system, from which I have learned that on July 7, 2020, MCLAMB queried the NCIC system approximately four times for license plate number 8073PN.

### C. **Tampering Offenses**

#### a. **LEMAY provides law enforcement confidential information and then deletes the evidence**

136.    I have reviewed a Maine Drug Enforcement Agency ("MDEA") incident report dated June 9, 2020, from which I have learned that on June 5, 2020, an MDEA agent known to me was contacted by LEMAY, the defendant, who was then a Police Officer in the Wilton Police Department.  LEMAY informed the MDEA agent that SCOVIL had contacted LEMAY. SCOVIL informed LEMAY, who was a former colleague of SCOVIL, that SCOVIL was concerned that he was being followed and that people were taking pictures of his properties. SCOVIL asked LEMAY to query law enforcement databases regarding the license plate of a truck that SCOVIL had obtained from a video image made by a camera set up to monitor SCOVIL's driveway.  LEMAY did so in order to see who owned the truck in question, but the license plate came back as "not on file," indicating that the truck was likely a law enforcement vehicle.  Thereafter, LEMAY called the MDEA agent to inquire if the truck in question belonged to an MDEA agent.

137.    The MDEA agent further wrote that approximately 10 minutes after his conversation with LEMAY, DOUCETTE called the MDEA agent.  DOUCETTE asked the MDEA agent if the MDEA agent wanted a tour of his boss's marijuana facility, whom the MDEA agent understood to be SIROIS.  DOUCETTE further stated that the MDEA agent should take a tour because DOUCETTE knew that the MDEA agent was watching him and SCOVIL.  DOUCETTE further stated that DOUCETTE and SCOVIL had been followed and watched in the past few days, and as a result, that they had called the Office of Marijuana Policy, the local police departments in the area, and their insurance company, and were informed that nobody was watching them.  Therefore, SCOVIL and DOUCETTE had surmised that MDEA

was watching them.  The MDEA agent denied that SCOVIL and DOUCETTE were under surveillance.

138.    Following the federal search and seizure action that took place on about July 21, 2020, FBI agents conducted a consensual interview with LEMAY.  LEMAY admitted that he had looked up license plates for SCOVIL and that he had sought to determine whether SCOVIL was being investigated by MDEA on SCOVIL's behalf, even though he understood that SCOVIL was no longer a law enforcement officer and worked for LUCAS SIROIS in the marijuana business.  LEMAY stated that after he learned of the July 21, 2020 federal search warrant action, LEMAY deleted text messages between himself and SCOVIL and DOUCETTE showing that LEMAY had accepted gifts from SCOVIL and DOUCETTE, including CBD cream; and that SCOVIL and DOUCETTE had asked LEMAY to promote NGD at LEMAY's mixed martial arts fight, and had offered to sponsor him.  LEMAY stated that he deleted these messages because he wanted to distance himself from SCOVIL and DOUCETTE.  FBI agents reviewed LEMAY's cellular phone and confirmed that the messages LEMAY described were not present on the phone.

### b.  ALVES corruptly informs SCOVIL that SIROIS is under federal investigation in an attempt to obstruct that investigation

#### i.  Text message communications

139.    From publicly available information, and from my participation in this investigation, I know that ALVES, the defendant, works as an Assistant District Attorney in the Franklin County District Attorney's Office (District Three).  I further know based on my review of property records that ALVES lived next door to SCOVIL during the relevant time period. Based on my review of text messages recovered from a search of the SCOVIL Cellphone, I know that ALVES and SCOVIL worked together when SCOVIL was a Franklin County Deputy

Sheriff, and that ALVES and SCOVIL remained friendly after SCOVIL left the Sheriff's Office.

140.    I have reviewed text message exchanges between SCOVIL and ALVES[9]

recovered from SCOVIL's cellular phone and dated December 9, 2019, which can be

summarized as follows:

| | |
|---|---|
| SCOVIL: | Apparently Derrick and I do security for a marijuana grow.  What they don't realize is Derrick and I opened a state licensed and insured CBD distribution company.  We don't use or touch marijuana, have no interest.  Things are going great and we are happy.  The sheriffs office is a horrible place to work. |
| ALVES: | I think it's awesome that you and Derrick left.  I don't understand why everyone is pissed and gossiping about what you two are doing.  You're happy that's all that matters. |
| SCOVIL: | They think we are doing illegal stuff.  Poorly educated.  You can buy the products we sell at Irving and local stores. |
| ALVES: | You are selling to companies only in Maine? |
| SCOVIL: | Yes. |
| ALVES: | How'd you two get involved in that? |
| SCOVIL: | Got approached by Randy Cousineau, a local billionaire who said I need some business partners who are willing to operate this business.  You will be a millionaire within the first 5 years of business.  I was like when do I start |
| ALVES: | Haha I'd drop everything for that too.  Good for you guys |
| SCOVIL: | I make a months sheriff office pay in one week. … Plus a company car, gas, phone, computer etc |
| ALVES: | I hate you. |
| SCOVIL: | Haha I'm gonna let everyone keep thinking I'm in the weed business, or doing security or whatever they want to think |

---

[9]    The SCOVIL Cellphone lists a telephone number ending in 8827 under a contact labeled "Kayla Alves."  I have reviewed subpoena returns from Verizon Wireless which show that ALVES is the listed subscriber for the telephone number ending in 8827.

| | |
|---|---|
| ALVES: | Do you need an assistant??? |
| SCOVIL: | We need sales reps actually.  65k a year plus a vehicle and gas and benefits |
| ALVES: | I'm not a good sales person.  I couldn't sell water in the desert |
| SCOVIL: | Haha same.  I do the office work.  Well kinda, I play all day.  Watch tv and hangout haha |

141.    I know from my training and experience, and from my involvement in this investigation that the messages summarized above reflect a comfortable and friendly relationship between SCOVIL and ALVES.  I believe that after SCOVIL (falsely) described how he became involved in the CBD business (the investigation has shown that LUCAS SIROIS and not RANDAL COUSINEAU recruited SCOVIL and DOUCETTE into the marijuana (not CBD) business), and described the potential economic upside, ALVES jokingly asked whether SCOVIL needed an assistant.  I believe that SCOVIL's reply was made in earnest, however. SCOVIL described a specific job that was available (sales representative) as well as salary and a benefits package.  ALVES demurred ("I'm not a good sales person") and the conversation continued.

142.    I have reviewed text messages between SCOVIL and ALVES sent on about December 29, 2019 and December 30, 2019, which can be summarized as follows:

| | |
|---|---|
| ALVES: | Hey I know it's late but I need help.  I need to find someones address / number.  Do you know anyone that would do it without asking any questions? |
| SCOVIL: | I don't.  I've been shunted by all of them.  I'm apparently corrupt. |
| ALVES: | That's a compliment coming from them.  The bastards. |
| SCOVIL: | For real. |

143.    I know from my training and experience that the messages described above show

that ALVES was seeking to obtain identifying information for an individual utilizing law enforcement resources for reasons unrelated to her employment. When ALVES asked SCOVIL if he knew "anyone that would" assist ALVES in finding the "address / number" of an individual "without asking any questions," I believe that ALVES was asking SCOVIL to contact a current member of law enforcement who had access to law enforcement databases, such as NCIC, to conduct a search for the identifiers of an individual, and who would do so without requiring a law enforcement purpose. Although, as discussed above, SCOVIL did maintain contact with such individuals, and in fact leveraged those relationships for his own ends, he declined to assist ALVES here, falsely stating that he had be "shunted" (sic) by all of his current law enforcement contacts. I believe ALVES's request fell outside of the scope of her official duties, because I know that Assistant District Attorneys can request that law enforcement officers run searches through NCIC, CLEAR, and similar databases, assuming that the request is made for law enforcement purposes.

144.    I have reviewed text messages between SCOVIL and ALVES sent on about April 8, 2020, which can be summarized as follows:

| SCOVIL: | Random question. Would you know if I was being investigated my mdea or the state? I had someone follow me today from work, to the car wash, to the bank, and then back to work. It was a state vehicle because the plate didn't come back on file. I then pulled into work. And started to follow them around all the way back to new Sharon. I have nothing to hide. Doing everything 110% legal just made me curios today |
|---|---|
| ALVES: | I wouldn't have any idea if you're being investigated, especially now since I'm working from home. If I hear anything I'll let you know |
| SCOVIL: | Haha you don't have to I'm sure it would be a violation of you did etc. I wouldn't want or expect you to do anything that could effect you, a case, etc. I just found that kinda odd today. I'm sure I'll find out eventually |

| ALVES: | I really haven't heard anything. They likely wouldn't be able to tell me anyway since you and I worked together. It would be sent elsewhere for prosecution. Did you find anything when you followed the guy? |
|---|---|
| SCOVIL: | Just that it's a state vehicle based on the fact that the plate didn't come back. Middle aged man with a beard driving it. Derrick was with me 100% it was probably mdea. We don't mind. We know everything we do is legal. We've had state inspections. Just comical more than anything. They want the news headlines… former deputies etc |
| ALVES: | Now that no one is getting arrested they have nothing to do. I don't understand why people care so much about what you two are doing |
| SCOVIL: | Jealousy? Easy schedule? Good money? No clue. Alcohol sales along with Tobacco were once illegal too. Times change and they need to change with it. We are happy. They don't like to see people happy. When we left we told them that place was corrupt and half the deputies shouldn't have certifications because they commit felony's and lie. They don't like that. They sent us home 5 mins later |
| ALVES: | Our office barely speaks to anyone from there. I hope you two are living your best life and are ignoring those douchebags |

145.    I know based on my training and experience and on my participation in this investigation that the messages described above show that SCOVIL directly asked ALVES whether she was aware if SCOVIL and his associates were under investigation in about April 2020. SCOVIL stated that the reason he suspected that he was under investigation was because he had observed a vehicle surveilling him, and that the license plate number associated with the vehicle "didn't come back on file," which I believe indicates that SCOVIL was able to run the license plate through law enforcement databases as early as April 2020 by leveraging his and DOUCETTE's law enforcement network. I know that when a license plate is not listed in the state database, it could mean that the license plate was issued to a law enforcement agency.

SCOVIL indicated to ALVES that he believed that the law enforcement agency investigating him was the MDEA at this time.  In response to his request, ALVES did not ask how SCOVIL knew the results of the license plate look-up.  ALVES did not ask why he believed MDEA was investigating him.  ALVES did not state (although SCOVIL did) that such a request was inappropriate, and ALVES could not respond in the affirmative without violating her professional duty to maintain the confidentiality of any pending law enforcement investigation to which she was privy.  Instead, ALVES responded that she would let SCOVIL know if she heard anything about a pending investigation concerning him.

### ii.   Events of July 8, 2020

146.   I know from my involvement in the investigation that on about June 13, 2020, law enforcement sought and obtained a pen register on the SCOVIL Cellphone.  The pen register was active until about August 12, 2020.  I know from my training and experience that a pen register is a surveillance device that captures the phone numbers dialed on outgoing calls, and captures the numbers identifying incoming calls, on the target telephone.  In addition to the counterparty telephone number, the pen register also records the length of each phone call, but does not record content information.

147.   Based on pen register data collected from SCOVIL's cellular phone, I know that on July 8, 2020 at about 8:49 am, SCOVIL called ALVES.  That phone call lasted approximately 14 minutes.

148.   I have reviewed the audio recording and transcript of a telephone call intercepted on the SIROIS Cellphone between SIROIS and SCOVIL (Session 1245) that was initiated by SCOVIL at about 9:17 am on July 8, 2020, just 14 minutes after SCOVIL's conversation with ALVES concluded.  The conversation between SCOVIL and SIROIS can be summarized in

relevant part as follows:

SCOVIL:        Well, so I found out that the plate that comes back on that Toyota comes back as Department of Public Safety. [crosstalk] Um, Yup which would be the IRS, the Maine Revenue Service, State Police, OMP, or DEA.

SIROIS:        Or or DEA?  So options?

SCOVIL:        Yeah it could be any of those services.  Well also under the same umbrella like the communications, Emergency Management, EMS, all that bullshit.

SIROIS:        Right.

SCOVIL:        But, I also heard back from the Attorney General's Office this morning and they basically said that we don't look into stalking complaints you need to go through your local your local police department.  So I call the Farmington District Attorney's Office today and they're—they're going to call the Feds and see if it is them.  They're---Kayla—lives right next to me in Farmington.  She is the ADA down here.

SIROIS:        Yup.

SCOVIL:        And I have kept her up to date with everything and I told her I'm like, I heard back from the Attorney General's Office today and this is what they said.  She was like, K, I'll work on this today and I'll get back you.  She's like, we'll figure out who it is.

149.    Based on my training and experience and my involvement in the investigation, I believe that the messages summarized above show that SCOVIL is keeping SIROIS updated as to his and DOUCETTE's findings concerning a suspected investigation into their marijuana trafficking and related activities.  Specifically, SCOVIL informs SIROIS that he has determined that the license plate of the vehicle that was surveilling him returns to "Public Safety," meaning that one of a number of different law enforcement agencies may have been issued the license plate in question.  Significantly, SCOVIL relates a conversation that he had with "Kayla," the Franklin County Assistant District Attorney who lives next door to him in Farmington.  I believe

that "Kayla" is ALVES. SCOVIL states that ALVES informed him that she would "work on this today" and "get back to" SCOVIL, and that she and SCOVIL would "figure out who it is" that is investigating SCOVIL.

150.    Based on pen register data collected from SCOVIL's cellular phone, I know that on July 8, 2020 at about 9:36 am, ALVES called SCOVIL. That phone call lasted approximately 7 minutes.

151.    I have reviewed the audio recording and transcript of a telephone call intercepted on the SIROIS Cellphone between SIROIS and SCOVIL (Session 1253) that was initiated by SCOVIL at about 9:43 am on July 8, 2020, just 2 minutes after SCOVIL's conversation with ALVES concluded. The conversation between SCOVIL and SIROIS can be summarized in relevant part as follows:

| | |
|---|---|
| SCOVIL: | So what's going on with you and [CC-7]? Do you guys have some deal you guys are doing or working on? Or… |
| SIROIS: | We haven't talked for like three weeks. |
| SCOVIL: | Well, other than just what I know about [them] selling you weed back and forth, is there –[are they] a licensed caregiver and stuff? |
| SIROIS: | Uh-huh. Yeah. |
| SCOVIL: | Okay. Well, supposedly, the feds and MDEA are looking into you. |
| SIROIS: | Uh-huh. |
| SCOVIL: | And so since Derrick and I are attached to you, they're just doing their homework on us as well, to see if we're linked and what our connections are with you, essentially. |
| SIROIS: | Uh-huh. |
| SCOVIL: | But they—the person I talked to, they said, I can't tell you really any information because I really don't know a whole lot, but I just know that they're looking into—they're looking into Luke, and they're looking into [CC-7]. |

SIROIS:        [CC-7].  What the fuck?  That ought to make [them] happy.

SCOVIL:        Well, I didn't tell [them] that.  But I don't really want to blow the fucking—this person's cover where I'm getting my information, because it might be a good source.  Because they would know any new information that would come in.  You know what I mean?

SIROIS:        Uh-huh.

SCOVIL:        But… so I just—we gotta stay on the down-low and only do legit deals.  And we gotta—I think we gotta spend the time this week and next week and really get our shit together, our licenses figured out.  Because the last thing we want them to do, especially if it's the feds, is to kick this fucking door out front and take down every plant.

SIROIS:        Right, yeah. Exactly.

SCOVIL:        So we need to cross every T and dot every fucking I and get this building, at least, under fucking wraps.

SIROIS:        Uh-huh.  Yeah.

* * *

SCOVIL:        Yep.  And they said they're—they said they are—they said that it's no secret.  The feds are following you, and they're following Derrick, and they're following Luke, and they're following everyone he is attached to.  And they're following his every move.  And I said, well, what's he doing?  And they said, well, that's the thing.  It's like we don't really know what they're hunting into.  But apparently when the local—a couple of local people found out that people were starting to look into us, I guess they got all pissed off.  They didn't want anyone local to know, because they were scared they would tip us off.  So they know—they know that we've been tipped off, essentially.  So maybe they'll back off their efforts.  But apparently—and this information, I guess, was like a month ago they were hot to trot, like really actively after us.  All of us.

SIROIS:        And since—

SCOVIL:        But I don't know why.  That's the thing, is, I don't know why.  We're being watched, and we know who it is now, but we don't know why.

SIROIS:          Right.

SCOVIL:          And they're looking into—

SIROIS:          Still—

SCOVIL:          Yeah.

SIROIS:          You still wonder if it might still stem from the sheriff's department, kind of what you said on the last conversation.

SCOVIL:          I don't know.  That's what I said.  I said, do you think it stems from that?  And she was like, no.  She goes—she goes, it's—they didn't bring up anything from the sheriff's office.

SIROIS:          Right.

SCOVIL:          But what throws a monkey wrench in it is [CC-7].  You know what I mean?

SIROIS:          Uh huh. Right. Yeah.

SCOVIL:          So that's—and then in my head I'm like, is Luke doing some deal with [CC-7] that I don't know about?  I don't fucking know.

SIROIS:          Nope.

* * *

SCOVIL:          I don't know.  I just think for the next six months to a year we should be dotting every I and crossing every fucking T and not doing anything shady.  You know what I mean?

SIROIS:          Right. No, yeah. Certainly.

SCOVIL:          Because I don't—the thing is, we don't know what they have on us for dirt now.  We don't know ho much information they have now.

SIROIS:          Right.

SCOVIL:          Fuck.  They could be waiting for one final straw to be like, oh, now we have A, B—they could have fucking A through Z on us, or fucking A through X on us now, and just waiting for Z before they kick the door in.  We don't know.

89

SIROIS:            Right. Nope. Nope. You're 100 percent right.

SCOVIL:            But I just—you don't need to end up in jail.  We don't need to end up in fucking jail.  We just—I don't know.

SIROIS:            No. This business has too much good potential. We're doing everything way too right to have the fucking—to have something screw it up.

SCOVIL:            Right.  I agree 100 percent.

SIROIS:            So.

SCOVIL:            I think we just—absolutely no fucking out-of-state sales of fucking anything.

* * *

SCOVIL:            I was on the phone with [Individual] for like 30 seconds, and then the district attorney called me back, and I was on the phone with them.  So I've got to call [Individual] back

* * *

SCOVIL:            … I mean, maybe they haven't—maybe they're kind of not finding what they want.  I don't know.  I just don't want to rough up too many feathers.  Maybe we can talk to [CC-7] or invite him over and have a sit-down.  I just don't—in hindsight, I don't really want to do anything over the phone, because they can tap into all these conversations.  You know what I mean?

SIROIS:            Yeah.  Hi feds.  How you doing?

SCOVIL:            Right.

SIROIS:            Wave.

SCOVIL:            Wave.  But like they think—I mean, even—phone calls are a lot harder for them to get, because they can only get them in like certain size sound bites.

SIROIS:            Yeah.

SCOVIL:            But they can—anything that's like a fucking text message, emails, that's gold to them.

SIROIS:            Right. Yeah.

90

SCOVIL:            So we're better off doing in-person meetings, if we can.

SIROIS:            Okay.

152.    Based on my training and experience, and my participation in the investigation, I believe that in the conversation described above, SCOVIL is relating information that he had just obtained from ALVES to SIROIS.  Specifically, SCOVIL informed SIROIS that his source, whom he had previously identified as ALVES, had informed him that the federal authorities were investigating SIROIS, SCOVIL, DOUCETTE, CC-7, and other individuals.  In light of this information, SCOVIL and SIROIS proceed to discuss the ways in which they should change their illicit marijuana operation in order to avoid arrest and prosecution by the federal authorities.  For example, SCOVIL (twice) urges SIROIS to "dot every I and cross every T," meaning that they need to bring their operations into total compliance with Maine marijuana laws, including "no more out-of-state sales" and avoiding any "shady deals."  SCOVIL also advises SIROIS that they should no longer use the phone to communicate, and that they should do all of their discussion in person to avoid detection by the federal authorities.  In fact, following this call, the number of criminal communications intercepted over the SIROIS Cellphone plummeted.

153.    I know from my involvement in the investigation that the information that ALVES provided to SCOVIL was accurate.  For example, CC-7 was a target of the investigation, and CC-7's name was included on early documentation associated with the investigation, though CC-7's importance in the investigation diminished as the investigation progressed.  It was also the case that the investigative team was very concerned about operational and information security, because the team was aware of ties to active law enforcement maintained by SCOVIL and DOUCETTE.  The timeline described by ALVES to SCOVIL was also accurate.  In early June, the investigation was paused for a variety of reasons, but then activity increased shortly

before the wiretap on the SIROIS Cellphone went live on about June 26, 2020.  In short, the information provided by ALVES to SCOVIL—that the federal authorities were investigating the Sirois Organization—was accurate, and was corruptly provided to SCOVIL at his request in contravention of ALVES's professional responsibilities, in order to help SCOVIL frustrate the investigation.  In fact, as described above, SCOVIL did just that.

### iii.  FBI Interview of ALVES and Seizure of the ALVES Cellphone

154.    On about July 21, 2020, FBI agents conducted a voluntary interview of ALVES at her home.  During that interview, in substance, ALVES admitted that she had told SCOVIL that he was under investigation.  However, ALVES denied that she knew that SCOVIL was under federal investigation.

155.    On about July 22, 2020, FBI agents obtained a judicially authorized search warrant authorizing the search and seizure of the ALVES Cellphone.  Also on that date, FBI agents executed the warrant, seizing the ALVES Cellphone.

156.    Subsequently, the ALVES Cellphone was searched.  I have reviewed text messages resident on the ALVES Cellphone sent and received on about the evening of July 21, 2020, between ALVES another individual, whose cellular phone number ended in 31 (the "31 Contact").  ALVES asked, "Do you think Brad threw me under the bus?  Or that they were lying looking for info?"  The 31 Contact responded, "Not sure[.]"  Later in the conversation, the 31 Contact stated, "Fingers crossed you'll never hear from them again[.]"  ALVES replied, "Exactly.  It's annoying to me.  Brad said he didn't talk at all but he told them about me.  If he invoked, why would my name come up?"

157.    I know from my involvement in the investigation that when ALVES asked whether "Brad threw me under the bus," she was wondering whether BRADLEY SCOVIL had

informed the FBI that ALVES had tipped him off to the existence of the federal investigation.

ALVES observed that SCOVIL had told her that he had "invoked" when interviewed by the FBI,

meaning that he had invoked his Fifth Amendment right to remain silent.  If that was the case,

ALVES wondered, "why would my name come up?"  I believe that the exchange summarized

above demonstrates that ALVES knew that she had informed SCOVIL of the existence of the

federal investigation, and surmised that the FBI had learned about the conduct from SCOVIL.

158.    The text message conversations between ALVES and SCOVIL recovered from

the SCOVIL Cellphone and summarized above were not resident on the ALVES Cellphone,

although there were numerous messages sent and received contemporaneously to the ALVES-

SCOVIL messages that were still present on the ALVES Cellphone.  Therefore, based on my

training and experience and forensic examinations of the ALVES Cellphone, I believe that once

ALVES learned that SCOVIL was under federal investigation, ALVES deleted the ALVES-

SCOVIL messages in order to ensure that they would be unavailable for use in this investigation.

### c.    MCLAMB deletes evidence after learning of the federal investigation

159.    I have reviewed Facebook instant messages sent and received by DERRICK

DOUCETTE and JAMES MCLAMB, the defendants, on about July 8, 2020 following the

telephone calls between ALVES and SCOVIL, and SCOVIL and SIROIS described above.

Those text messages can be described as follows:

| | |
|---|---|
| MCLAMB: | Read and destroy our shit |
| DOUCETTE: | Yes |
| MCLAMB: | I'll find out what I can.  Dude that's fucked though.  Why the fuck would the feds be looking at y'all? |
| DOUCETTE: | I have no idea man all we can think of is the sheriff office is pissed cause we run our mouths about them on Facebook exposing the corruption and shit probably trying to say we are doing illegal sales |

|  | or some shit which is bullshit they can gladly come and look at the books every sale goes to a legal storefront |
|---|---|
| MCLAMB: | What about tax shit? |
| DOUCETTE: | Nope we do direct deposit pay all taxes federal and state etc. and business pays taxes through our accountant etc |
| MCLAMB: | Shit. Idk bruh. I'm assuming your sources must have good info. Was Luke's name the only one metioned |
| DOUCETTE: | Luke Sirois or Lucas and [CC-7].  [CC-7] is [birthdate] and Lucas is [birthdate] |

* **

| DOUCETTE: | No luck on that info on miac? |
|---|---|
| MCLAMB: | No man … couldn't find a fucking thing |
| DOUCETTE: | Weird maybe who ever mentioned that was just sayin it |
| MCLAMB: | Why the fuck would they put out a maic for marijuana shit hahaha |
| DOUCETTE: | I feel like it's the s.o. just being cunts … Lmfao exactly |

160.    I know from my training and experience and my participation in the investigation that the messages summarized above show DOUCETTE discussing the fact that he is being investigated by federal law enforcement, while continuing to request law enforcement confidential information from MCLAMB.  For example, DOUCETTE provides the names of LUCAS SIROIS and CC-7 to MCLAMB along with their birthdates.  I believe that DOUCETTE did so in order to permit MCLAMB to more effectively search for additional information about these individuals in law enforcement databases.  DOUCETTE also asks MCLAMB if he found out anything about "miac."  I know from my participation in this investigation that MIAC is an acronym which stands for the Maine Information Analysis Center.  I know that the MIAC is designed to synergize information and enforcement efforts of federal, state, county local, and

tribal law enforcement agencies, and that certain investigations involving multiple agencies are run through the MIAC, including the instant investigation.  I believe that ALVES also provided SCOVIL with information that the MIAC was involved in the instant investigation.  When MCLAMB stated that he couldn't find anything relating to the MIAC, I believe MCLAMB had utilized law enforcement databases and/or other record repositories in order to search for additional information about the federal investigation DOUCETTE was seeking to better understand.

161.    On about July 30, 2020, FBI agents conducted a consensual interview with JAMES MCLAMB.  MCLAMB admitted that he had run license plates through the NCIC system for DOUCETTE, though he understood that DOUCETTE was no longer a law enforcement officer, and that he had informed DOUCETTE that one license plate came back to "Public Safety."  Further, MCLAMB admitted that after he learned that the federal authorities had conducted a search warrant operation on about July 21, 2020, MCLAMB deleted all of his text messages with DOUCETTE.  FBI agents reviewed MCLAMB's cellular phone and concluded that no text messages with DOUCETTE were present on the phone.

## VII.    CONCLUSION

162.    I respectfully submit, based on the facts set forth above, that probable cause exists to charge the defendants with the offenses specified in the attached Criminal Complaint, and that the attached Criminal Complaint be issued.

James Hendry
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date:    Oct 20, 2021,:

City and state:    Bangor, ME

_____
Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title

96